John O. ADAMS, Plaintiff–Appellant,

v.

PHILIP MORRIS, INC.,
Defendant–Appellee.

No. 94–5608.

United States Court of Appeals,
Sixth Circuit.

Argued April 13, 1995.

Decided Oct. 18, 1995.

Ronald D. Ray (argued and briefed), Louisville, KY, for Plaintiff–Appellant.

Douglas W. Becker (argued and briefed), and David P. Haick (briefed), Becker, Farris & Gallagher, Louisville, KY, for Defendant–Appellee.

Before: MERRITT, Chief Judge; KEITH and WELLFORD, Circuit Judges.

WELLFORD, Circuit Judge.

Plaintiff John O. Adams, a white male approximately fifty-five years of age, brought an Age Discrimination in Employment Act (ADEA) claim and a reverse discrimination claim based on race against Philip Morris, Inc. ("PM"), his former employer. He alleges that PM failed to consider adequately his application for reemployment after having entered into a termination agreement providing for special severance pay. The district court granted defendant's motion for summary judgment based on a broad, general release signed by Adams at the time of his separation from employment. We **AFFIRM** in part and **REMAND** in part.

## I. *OVERVIEW*

Adams began work at PM's cigarette manufacturing plant in Louisville in 1980. During his nine-and-a-half-year tenure with the company, Adams worked as a mechanical supervisor responsible for the maintenance of the company's high speed cigarette manufacturing machines. Several letters of recommendation on behalf of Adams favorably describes his work for the company.

On January 29, 1990, PM announced a layoff of 52 employees, including Adams, at the Louisville plant. Adams, and the others affected, were offered severance packages that included salary continuation, health insurance coverage for an extended time, and certain other benefits. In addition, these workers were offered enhanced severance packages if they signed a general release of liability. Adams chose to accept the enhanced package and, as a result, received approximately twice the amount of salary continuation, benefits for a period of approximately eighteen months instead of sixteen weeks, and certain employment assistance, including financial aid of up to $5,500. Adams signed the following release on January 29, 1990:

> KNOW ALL PERSON BY THESE PRESENT, THAT I, John O. Adams, residing at 1212 Weible Road, Crestwood, Kentucky, 40014, for and in consideration of severance pay in the amount of $32,-767.00 payable in form of salary continuation ... and a lump-sum payment of 3,542.00 Dollars for accrued but unused vacation, ... together with continued benefit coverage ... [and] outplacement assistance, release, remise and forever discharge Philip Morris Companies, Inc.... of and from all and in all manner of presently existing actions, causes of action, suits, debts, claims and demands whatsoever in law or equity arising from my employment with the Company....

The release also specifically acknowledged that Adams was "settling all claims which I have ever had *or may have with the Company.*" In addition, the release contained a

provision that stated: "[I] do hereby forever waive any and all right to assert any claim or demand for *reemployment* or tenure with the Company or for any benefits, etc., not specifically enunciated herein."[1] Before signing this release, Adams had five days to consider whether to sign it and also had an opportunity to consult with an attorney.

A little more than a year later, on March 3, 1991, while still receiving extra benefits, Adams read a local newspaper notice advertising what appeared to be his former position. Adams contacted Hayes, a friend who was a production supervisor with PM, who told him that a position had become open after another employee, Frank Zanchi, had left the company. The production superintendent for the plant told Adams that he was eligible to apply for the open position, and that he would "have a leg up on anybody else that applies."

Adams then applied, but the job was awarded to a young, black candidate, who Adams claims, had "no experience with high speed cigarette machines." Adams then filed a complaint with the EEOC, alleging age discrimination and reverse discrimination based on race, but the EEOC issued a no-cause response after investigation. Adams subsequently filed an action in district court.

The district judge granted the company's motion for summary judgment, concluding that the general release signed by Adams precluded any claims he might have against the company. The court noted that the settlement agreement was supported by adequate consideration, and that it had addressed the issue of reemployment by providing that Adams "waived any and all right to assert any claim or demand for reemployment...."

Adams has filed a timely appeal, and there is appellate jurisdiction pursuant to 28 U.S.C. § 1291.

## II. *STANDARD OF REVIEW*

 We review a grant of summary judgment *de novo. See Henegar v. Banta,*

---

1. The release also provided: "I waive all rights to assert any claim for benefits from employment with the Company," and "I waive any right to recover damages under the Age Discrimination in Employment Act."

27 F.3d 223, 225 (6th Cir.), *cert. denied,* —— U.S. ——, 115 S.Ct. 664, 130 L.Ed.2d 599 (1994). A party is entitled to summary disposition "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). All reasonable inferences are to be given to the non-moving party. *Henegar,* 27 F.3d at 225 (citing *Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 157, 90 S.Ct. 1598, 1608, 26 L.Ed.2d 142 (1970)). We note, however, that

> [w]hen a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials of the adverse party's pleadings, but the adverse party's response ... must set forth specific facts showing that there is a genuine issue for trial. If the adverse party does not so respond, summary judgment, if appropriate, shall be entered against the adverse party.

Fed.R.Civ.P. 56(e).

### III. *KNOWING AND VOLUNTARY RELEASE*

▮ Although Adams does not directly challenge whether the release was knowingly and voluntarily executed, he alludes to this issue by suggesting that he "was forced to sign the general release" out of "extreme economic distress" and that he "was given a mere five days to sign and return the release." We ordinarily consider issues not fully developed and argued to be waived. *See generally, Wright v. Holbrook,* 794 F.2d 1152, 1156–57 (6th Cir.1986) (considering issue raised for the first time in reply brief to be waived). Because it is clear that this release was knowingly and voluntary executed, we take this opportunity now to resolve this issue.

▮ We have recognized that under particular circumstances employers and employees may negotiate a valid release of ADEA and Title VII claims. *Runyan v. National Cash Register Corp.,* 787 F.2d 1039 (6th Cir.), *cert. denied,* 479 U.S. 850, 107 S.Ct. 178, 93

L.Ed.2d 114 (1986). We have applied ordinary contract principles in determining whether such a waiver is valid, remaining alert to ensure that employers do not defeat the policies of the ADEA and Title VII by taking advantage of their superior bargaining position or by overreaching. *Runyan,* 787 F.2d at 1044–45. In evaluating whether a release has been knowingly and voluntarily executed, we look to (1) plaintiff's experience, background, and education; (2) the amount of time the plaintiff had to consider whether to sign the waiver, including whether the employee had an opportunity to consult with a lawyer; (3) the clarity of the waiver; (4) consideration for the waiver; as well as (5) the totality of the circumstances. *See, e.g., Bormann v. AT & T Communications,* 875 F.2d 399 (2d Cir.), *cert. denied,* 493 U.S. 924, 110 S.Ct. 292, 107 L.Ed.2d 272 (1989); *Riley v. American Family Mutual Ins. Co.,* 881 F.2d 368 (7th Cir.1989).

It is evident, from Adams' correspondence in the record and his supervisory experience, that he was generally knowledgeable and aware of his rights. The waiver is plain and unambiguous, and easily understandable by someone of Adams' abilities. Adams had five days in which to consider whether to sign the waiver, and was advised by PM to consult with an attorney before doing so. By signing the waiver, Adams received approximately twice as much in termination benefits than he would have been entitled to under the normal severance package plans. Although he certainly felt some economic pressure to accept the attractive severance package and settle any potential claims he might have against PM, this pressure does not rise to the level of economic duress. Accordingly, we hold that the release was knowingly and voluntarily executed by Adams and we AFFIRM summary judgment for PM in this respect.

### IV. *EFFECT OF RELEASE AND SEVERANCE AGREEMENT*

▮ The language of the "general" release in this case is concededly very broad. Adams does not contend on appeal that the release is ineffective to waive his employment claims arising from the reduction-in-force; rather, he contends that the release is inef-

fective to waive his prospective claims arising from his reapplication with PM.

 The Supreme Court has stated that "an employee's rights under Title VII are not susceptible of prospective waiver." *Alexander v. Gardner–Denver Co.*, 415 U.S. 36, 51–52, 94 S.Ct. 1011, 1021, 39 L.Ed.2d 147 (1974). Although some courts have questioned whether this language was dictum in *Gardner–Denver*,[2] we held that this statement precluded minority police officers in a consent decree from waiving their prospective rights under Title VII. *Williams v. Vukovich*, 720 F.2d 909, 926 (6th Cir.1983).[3] We agree with the other circuits that there is no reason to distinguish between ADEA claims and Title VII claims as to this issue. *See Bender v. A.G. Edwards & Sons, Inc.*, 971 F.2d 698, 700 (11th Cir.1992). It is the general rule in this circuit that an employee may not prospectively waive his or her rights under either Title VII or the ADEA.

 Yet, not every settlement agreement that refers to postsettlement conduct necessarily results in a prospective waiver. Indeed, we have recognized that when a settlement agreement incorporates the future effects of prior discrimination, it effectively bars new discrimination claims based on post-settlement conduct that stems directly from, or is a continuing effect of, past discrimination. *See Huguley v. General Motors Corp.*, 52 F.3d 1364 (6th Cir.1995). *See also United States v. Allegheny–Ludlum Indus.*, 517 F.2d 826, 853 (5th Cir.1975), *cert. denied sub nom. Harris v. Allegheny–Ludlum Indus.*, 425 U.S. 944, 96 S.Ct. 1684, 48 L.Ed.2d 187 (1976). Where a release waives rights unknown to the releaser at the time of signing the waiver, or, as in this case, the claimant waives rights protecting against conduct that has not yet occurred, the release must be particularly scrutinized as to the intent of the parties. For example, *AM Int'l, Inc. v. International Forging Equip. Corp.*, 982 F.2d 989 (6th Cir.1993), found summary judgment inappropriate where the release stated it applied to "all claims, known or unknown," but, because the events triggering the federal cause of action had not yet occurred, the panel found that the parties may not have contemplated or intended the release to bar such future claims. Here there is no clear evidence in the record before us as to whether the parties intended the release to bar claims arising from conduct that had not yet even occurred. Therefore, summary judgment on this issue was inappropriate. Adams claims that PM discriminated against him anew by failing to consider his reapplication with the company; on the other hand, whatever discrimination that might have occurred may have related back or was a continuing effect of the alleged age discrimination that prompted the settlement agreement.

*Huguley* may support the effectiveness of the waiver if Adams' claim can be shown to be a "continuing effect" of past discrimination. The district court made no such determination on the facts here. At the time Adams signed the release in 1990, he had made no claim of discrimination. The release did indeed waive any claims that he may have had *at that time*. As no findings have been made about any prior discrimination, further factfinding would be necessary to determine if this is a "continuing effect" of any prior discrimination. Summary judgment at this time is therefore inappropriate under *Huguley*. In both *Huguley II*, 52 F.3d at 1372, and *Huguley v. General Motors Corp.*, 35 F.3d 1052, 1056 (6th Cir.1994) ("*Huguley I* "), we held that claims alleging new, post-consent, non-related and non-continuing decree acts of discrimination might proceed. Because at least a portion of

**2.** *See, e.g., Bender v. A.G. Edwards & Sons, Inc.*, 971 F.2d 698, 699 (11th Cir.1992) (questioning whether a previous Eleventh Circuit panel had properly construed *Gardner–Denver* ).

**3.** We also stated in *Vukovich:*

The defendant has given up the possibility of prevailing on the merits in exchange for granting certain limited affirmative relief to plaintiffs.... Plaintiffs have exchanged their right to obtain adjudicatory relief which would fully eliminate the effects of discrimination in the past *as well as in the future.* ... A consent decree, therefore, should be strictly construed to preserve the *bargained for position of the parties.* ... Voluntary settlement is the preferred method of eliminating employment discrimination.

720 F.2d at 920, 923 (emphasis added).

Adams' claim alleges post-release conduct and no findings have been made concerning any "continuing effects" based on past discrimination that warrant a "relation back" doctrine, we must remand as to that aspect of this controversy.

Included in the issue remanded is the question whether Adams, by signing the release, by reason of its broad language, had taken himself out of PM's labor pool and could never be employed there again. The question is, once again, the question of the intent of the parties at the time of signing the release, whether it was intended that Adams be taken out of PM's labor pool forever, even in the face of future alleged race and age discrimination.

This is a case of contract construction. The scope of a release, like any contract, depends on ascertaining the intent of the parties at the time of signing the release. The dispositive inquiry is "what did the parties intend?" Intent is determined by reviewing the language of the entire instrument and all surrounding facts and circumstances under which the parties acted in light of the applicable law as to employment discrimination at the time. It is necessary to examine all the circumstances surrounding the formation of the release. Whether it was the intent of the parties to bar Adams from its particular labor pool forever is a question of fact not answered on the record before us. Summary judgment is, therefore, inappropriate at this time on this record as to this contract issue.

In providing Adams with an enhanced severance package, did PM seek to accomplish more than to settle any claim of discrimination Adams might bring as a result of the reduction-in-force? Did PM, by reducing its work force in 1990, reasonably believe that the company would never have to deal with Adams (or other retirees) by virtue of the reemployment agreement in view of the status of employment discrimination law at the time? Did Adams intend to withdraw forever from PM's work force? Did PM, in effect, accept Adams' application and interview him,

leading Adams reasonably to believe he was eligible for reemployment?

To set aside Adams' waiver in this case, after he had received enhanced benefits, may seem both inequitable and unfair. Adams is currently receiving additional benefits under the severance package, yet seeks to gain additional benefits of reemployment. If Adams were deemed entitled to be considered for reemployment, PM might thereby be denied the benefit of its bargain. Some adjustment might therefore be appropriate in such a circumstance, if Adams were ultimately found entitled to reinstatement or to damages.

An employer cannot purchase a license to discriminate. See United States v. Trucking Employers, Inc., 561 F.2d 313, 319 (D.C.Cir.1977) ("An employer cannot purchase a license to avoid its duty to eliminate practices which perpetuate prior discriminatory acts any more than it can circumvent its responsibility for future acts of purposeful discrimination."). An employment agreement that attempts to settle prospective claims of discrimination for job applicants or current employees may violate public policy under Gardner–Denver [4] and related cases unless there were continuing or future effects of past discrimination, or unless the parties contemplated an unequivocal, complete and final dissolution.

In summary, we hold that PM is entitled to summary judgment on the issue of the execution of the release and waiver, and the execution thereof, by Adams knowingly and voluntarily. We must, however, **REVERSE** and **REMAND** on the issue of the intent of the parties in executing the agreement of waiver and release in light of the then existing employment discrimination law. We do not, in light of the remand, reach the question raised by Adams—whether PM should be estopped by its conduct in allegedly inviting Adams to reapply for the position he contends was his former job. The district court,

---

4. The Supreme Court has, since Gardner–Denver, enforced employment contracts that compel arbitration and prospectively waive the employee's right to a judicial forum. See Gilmer v. Interstate/Johnson Lane Corp., 500 U.S. 20, 111 S.Ct. 1647, 114 L.Ed.2d 26 (1991).

on **REMAND**, will consider and make findings on this issue as well.