**Marvin PARKER, Plaintiff,**

v.

**KEY PLASTICS, INC., Defendant.**

No. 98–73753.

United States District Court,
E.D. Michigan,
Southern Division.

Oct. 22, 1999.

Frederick L. McDonald, Ann Arbor, MI, for Plaintiff.

Chester Kasiborski, Jr., Detroit, MI, for Defendant.

## OPINION AND ORDER REGARDING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

ROSEN, District Judge.

### I. INTRODUCTION

On August 25, 1998, Plaintiff Marvin Parker commenced this employment discrimination suit against his former employer, Defendant Key Plastics, Inc., alleging that Defendant treated Plaintiff differently from his fellow employees on account of his disability and that Defendant retaliated against Plaintiff for filing discrimination charges with the Equal Employment Opportunity Commission ("EEOC"). Plaintiff's Complaint asserts a discrimination claim under the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101 *et seq.*, and a claim of retaliation in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*

By motion filed on June 15, 1999, Defendant now moves for summary judgment on these claims. In this motion, Defendant argues: (i) that Plaintiff's failure to identify any Title VII violations in his charges filed with the EEOC precludes him from pursuing Title VII claims before this Court; (ii) that Plaintiff has released certain of his claims by signing a settlement

agreement; and (iii) that Plaintiff's remaining claims fail for lack of evidence that his disability or his filing of EEOC charges were factors in Defendant's decisions relating to the terms and conditions of Plaintiff's employment. Plaintiff filed an untimely response to this motion on July 23, 1999,[1] and Defendant filed a reply on July 28, 1999. Although no further briefs are permitted under the governing rules, *see* Local Rule 7.1(c)(1)(A), Plaintiff filed an additional "response" brief on August 6, 1999.[2]

On October 7, 1999, the Court heard oral argument on Defendant's motion. Having considered the arguments of counsel at this hearing, and having reviewed the briefs and supporting documents submitted by the parties, the Court is now prepared to rule on this motion. This Opinion and Order sets forth the Court's ruling.

## II. *FACTUAL BACKGROUND*

### A. Plaintiff's Initial Hiring, Discharge, EEOC Charge and Settlement

On June 23, 1993, Defendant Key Plastics hired Plaintiff Marvin Parker to work as a press operator at Defendant's plant in Plymouth, Michigan. According to Plaintiff's Complaint, Defendant was "made aware of Plaintiff's disabilities" at the time of his hiring, including his limited use of his left hand and his status as a recovering substance abuser. (Complaint at ¶ 13; *see also* Plaintiff's Dep. at 7–9.)

In September of 1994, Plaintiff was discharged by Defendant, for reasons that do not appear in the record. On September 2, 1994, Defendant agreed to reinstate Plaintiff, subject to his agreement to enter into and regularly attend a substance

abuse rehabilitation program. (Defendant's Motion, Ex. A.)

Following this discharge and reinstatement, Plaintiff filed a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC"). In this charge, Plaintiff alleged that he was discharged for violating a plant rule, but that co-workers who were not disabled had violated this same rule without being discharged. (Defendant's Motion, Ex. B.) Plaintiff further alleged that his discharge violated the Americans with Disabilities Act ("ADA"). (*Id.*)

By agreement executed on February 8, 1995, Plaintiff and Defendant agreed to settle, and Plaintiff agreed to release, all claims arising from "any matter, cause, fact, circumstance, or thing whatsoever" occurring prior to the date of the agreement, including the matters raised in Plaintiff's EEOC charge. (Defendant's Motion, Ex. C.) As part of this settlement, Plaintiff agreed to withdraw the charge he had filed with the EEOC.

### B. Plaintiff's Second Discharge, Reinstatement, Settlement and EEOC Charge

At his deposition, Plaintiff testified that from February of 1995 until July of 1997, he had no complaints that Defendant treated him unfairly or discriminated against him on account of his disability. (Plaintiff's Dep. at 47.) On July 7, 1997, however, Plaintiff was discharged by Defendant a second time, this time for allegedly "swiping" another employee's time card in violation of plant rules.[3] As Plaintiff acknowledged at his deposition, the plant rules expressly provide that an employee

---

**1.** Under Local Rule 7.1(d)(1)(B) of the U.S. District Court, Eastern District of Michigan, Plaintiff's response was due within 21 days after service of Defendant's motion, or by July 6, 1999. Plaintiff filed his response 17 days after this deadline.

**2.** In addition, at the Court's request, Defendant submitted a complete copy of Plaintiff's deposition, and Plaintiff filed an amended re-

sponse brief attaching the exhibits he referred to but not provide in his initial response.

**3.** Defendant maintains an electronic time badge system at its Plymouth plant, under which employees clock in and out electronically by "swiping" their time badges through an electronic reader.

who swipes another employee's time card is subject to discharge, even for a first infraction. Although Plaintiff denied that he had swiped the time badge of his fellow employee, Christina Foster, Defendant's Human Resources Manager, Brad Hagemeyer, concluded after an investigation that Plaintiff had in fact committed this violation of plant rules. Accordingly, both Plaintiff and Ms. Foster were discharged.[4]

Both Plaintiff and Ms. Foster filed grievances protesting their discharges. In August of 1997, Defendant agreed to reinstate these two employees, subject to their agreement to: (i) serve a 30–day unpaid suspension, (ii) settle their grievances relating to their discharges, as well as "any and all other claims relating to" these discharges, and (iii) a one-year "last chance" condition upon their employment, under which they remained free to file grievances challenging the factual basis for any claimed violations of plant rules, but waived their rights to contest the "reasonableness of any penalty assessed" for any such violation. (Defendant's Motion, Ex. G, H.) On August 1, 1997, both Plaintiff and Ms. Foster signed identical versions of this agreement, although both noted on the settlement documents that their signatures were given "under duress." (*Id.*)

Despite this agreement, Plaintiff filed a second charge with the EEOC just three days later, on August 4, 1997. In this charge, Plaintiff denied that he had swiped another employee's time card, and alleged that Defendant had unfairly disciplined him in retaliation for his prior EEOC complaint filed in 1994. (Defendant's Motion, Ex. I.) Plaintiff asserted that his complaint was based on the ADA and the Michigan Handicappers' Civil Rights Act, but he made no mention of Title VII. (*Id.*)

In his affidavit in support of Defendant's motion, Mr. Hagemeyer specifically denies

that he had any knowledge of Plaintiff's 1994 EEOC charge when he decided to discharge Plaintiff for swiping another employee's time card, (Hagemeyer Aff. at ¶¶ 20–21), and Plaintiff admits he does not know whether Mr. Hagemeyer was aware of his earlier EEOC complaint at the time of his discharge on July 7, 1997. (Plaintiff Dep. at 48.) Plaintiff, however, contends that Mr. Hagemeyer's investigation and discharge decision were based primarily on information obtained from one of Plaintiff's supervisors, Manuel Walk, who allegedly is a "biased witness" and is responsible for "most of the discrimination" against Plaintiff. (Plaintiff's Response at 10.)

## C. Plaintiff's Third EEOC Charge

On September 4, 1997, Plaintiff filed his third EEOC charge, in which he alleged that a co-worker was given "preferential treatment in work assignments in retaliation for my most recently filed [EEOC] complaint." (Defendant's Motion, Ex. J.) He also noted a specific incident on September 4, 1997, when he was replaced on a job by this co-worker and was then given a "menial task to perform." (*Id.*) In this charge, like his previous one, Plaintiff cited the ADA and the Michigan Handicappers' Civil Rights Act but not Title VII, and he alleged only disability discrimination and retaliation and not other forms of discrimination. (*Id.*)

At his deposition and in his response to Defendant's motion, Plaintiff identified the worker who was given preferential treatment as Joanne Moore. According to Plaintiff, Ms. Moore was assigned to take Plaintiff's place on the press, while Plaintiff was given such tasks as sweeping the floors and cleaning the machines. (Plaintiff's Dep. at 53; Plaintiff's Response at 8–9.)[5] Plaintiff also testified that his breaks

---

4. In his affidavit submitted in support of Defendant's motion, Mr. Hagemeyer states that to the best of his knowledge, Ms. Foster does not suffer from any disabilities. (Hagemeyer Aff. at ¶ 17.)

5. Although Ms. Moore, like Plaintiff, had work restrictions, Plaintiff alleges that Moore was "less restricted than Plaintiff" because "she had the use of both hands while he had the use of one." (Plaintiff's Response at 8; *see also* Plaintiff's Dep. at 51.)

were closely monitored after he returned to work following his July, 1997 discharge, and that his supervisor, Manuel Walk, improperly demanded that Plaintiff produce his disability restriction papers "almost daily" during this time period. (Plaintiff's Dep. at 53–57.)

Plaintiff acknowledged that these complaints were addressed and the problems corrected within three weeks after he filed his third EEOC charge on September 4, 1997, so that he "knew [he] was being treated fairly." (*Id.* at 56–57.) He testified, however, that this improvement was short-lived and that problems arose periodically thereafter, though he elected not to file another EEOC charge to complain of these incidents. (*Id.* at 58.)

## D. Plaintiff's Final Discharge and Fourth EEOC Charge

In January of 1998, Plaintiff was again discharged by Defendant. Defendant's stated reason for this action was Plaintiff's alleged violation of Plant Rule 19 by confronting and threatening a co-worker, Collins Pruitt, on company premises. Although Plaintiff denied these allegations at the time, and continues to deny them in these proceedings, Hagemeyer ultimately concluded that Plaintiff had in fact threatened his co-worker, and decided to discharge Plaintiff for violating Plant Rule 19.

As with Defendant's prior discharge decision in July of 1997, Defendant reached its most recent decision following an investigation by Mr. Hagemeyer. In his affidavit, Hagemeyer described a January 15, 1998 complaint made by machine operator Collins Pruitt to a department manager, Greg Blaszczyk, who in turn relayed this complaint to Hagemeyer. In his complaint, Pruitt charged that Plaintiff had confronted him at the end of their shift that morning, made threatening comments, and challenged Pruitt to "take the

matter 'out to Plymouth Road.' " (Hagemeyer Aff. at ¶ 22.) Pruitt confirmed this complaint when interviewed by Hagemeyer later that day, stating that Plaintiff had "shouted at him 'what in the fuck do you mean' or words to that effect," had "called him a 'punk ass nigger,' " and had challenged Pruitt to " 'take this down on Plymouth Road.' " (*Id.* at ¶ 23.)

Hagemeyer then interviewed other employees, who corroborated some of the details of this incident, including Plaintiff's alleged reference to Pruitt as a "punk ass nigger." (*Id.* at ¶¶ 24, 29.) Hagemeyer also spoke with Plaintiff on two occasions; Plaintiff first "denied any knowledge of the incident with Mr. Pruitt," and then "was evasive and not forthcoming with any information" during the second interview. (*Id.* at ¶¶ 25, 28.) [6] Following these interviews, Hagemeyer concluded "that Mr. Pruitt had been truthful whereas [Plaintiff] had not" and that Plaintiff's discharge therefore was warranted, both for violating Plant Rule 19 and under the "last chance" agreement signed by Plaintiff after his previous discharge and reinstatement. (*Id.* at ¶¶ 30, 31.)

Plaintiff filed his fourth EEOC charge on February 18, 1998, protesting his most recent discharge. In this charge, Plaintiff complained that the co-worker involved in the incident, Mr. Pruitt, was not suspended or terminated. (Defendant's Motion, Ex. N.) He further alleged that he was suspended and discharged in retaliation for filing his previous EEOC charges, and cited this as an alleged violation of the ADA. (*Id.*) This charge, like the others, did not mention Title VII, nor did it allege any form of discrimination based on anything other than Plaintiff's disability.

At his deposition, Plaintiff admitted that the collective bargaining agreement covering his employment with Defendant included a provision establishing a policy of

---

6. At his deposition, Plaintiff testified that he told Hagemeyer "exactly what happened" during this second meeting: namely, that Pruitt had in fact confronted him at the end of their shift, but that the two had merely exchanged words and that Plaintiff had not threatened Pruitt. (Plaintiff's Dep. at 64, 67.)

"zero tolerance" for threats and intimidating conduct at Defendant's plant. (Plaintiff Dep. at 78.) He further testified, however, that both he and Mr. Pruitt should have been suspended pending a full investigation, and that ultimately neither he nor Pruitt should have been discharged "because there was nothing to be discharged for." (*Id.*) Plaintiff also testified that Pruitt had himself behaved in a threatening manner at a meeting called by Mr. Hagemeyer to investigate the incident, but that Pruitt had not been disciplined.[7]

In response, Defendant states that Mr. Pruitt was not suspended along with Plaintiff because Mr. Hagemeyer's investigation failed to produce any evidence or accusations that Mr. Pruitt had violated Plant Rule 19. In addition, Defendant points to Mr. Hagemeyer's statement in his affidavit that he has discharged six other employees for violating Plant Rule 19, none of whom, to his knowledge, was disabled. Although Defendant acknowledges that five of these six employees subsequently were reinstated, it notes that the sixth was, like Plaintiff, operating under a "last chance" agreement at the time she violated Plant Rule 19.[8]

In addition to filing an EEOC charge, Plaintiff also filed a grievance protesting his most recent discharge. At his deposition, Plaintiff testified that he was not given timely notice of the meeting at which the union considered whether to seek arbitration of this grievance. (Plaintiff's Dep. at 76–77.) The record does not disclose the action taken on Plaintiff's grievance.

### E. Procedural Background

Plaintiff brought this action on August 25, 1998, asserting claims of discrimination in violation of the ADA and retaliation in violation of Title VII. Plaintiff seeks reinstatement, an injunction prohibiting further acts of retaliation or discrimination, compensatory and punitive damages, and an award of attorneys' fees.

On June 15, 1999, Defendant filed the present motion for summary judgment, arguing (i) that Plaintiff's failure to cite Title VII in his EEOC charges precludes him from pursuing Title VII claims before this Court; (ii) that Plaintiff has released Defendant from liability under the settlement agreements he signed in 1995 and 1997; (iii) that Plaintiff has failed to produce evidence that his disability was a factor in any of the challenged employment decisions; and (iv) that Plaintiff cannot show a causal connection between his filing of EEOC charges and the challenged employment decisions. Plaintiff filed an untimely response to this motion on July 23, 1999, without attaching any supporting materials, and Defendant filed a reply in support of its motion on July 28, 1999.[9] On October 7, 1999, the Court heard oral argument on Defendant's motion.

### III. ANALYSIS

### A. The Standards Governing Defendant's Motion

In the motion presently before the Court, Defendant moves for summary judgment in its favor on both of Plaintiff's claims. Under the relevant Federal Rule, summary judgment is proper " 'if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to

---

7. Specifically, Plaintiff testified that Mr. Pruitt stated at this meeting, "I don't want to have to bring my shit." (*Id.* at 65.) Plaintiff then testified, "I guess he was referring to a gun, whatever," and he cited other instances where Pruitt allegedly had used the phrase "bring my shit" to refer to a gun. (*Id.* at 65, 73.)

8. This sixth employee ultimately was permitted to return to work for Defendant under an arbitrator's order.

9. Plaintiff then filed an additional response on August 6, 1999. No rule authorizes such an additional response. This response, like Plaintiff's initial one, was unsupported by any exhibits.

judgment as a matter of law.'" Fed. R.Civ.P. 56(c).

Three 1986 Supreme Court cases—*Matsushita Electrical Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986), *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986), and *Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)—ushered in a "new era" in the federal courts' review of motions for summary judgment. These cases, in the aggregate, lowered the movant's burden in seeking summary judgment.[10] According to the *Celotex* Court:

> In our view, the plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof.

*Celotex*, 477 U.S. at 322, 106 S.Ct. 2548.

After reviewing the above trilogy, the Sixth Circuit adopted a series of principles governing motions for summary judgment. These principles include:

> * Cases involving state of mind issues are not necessarily inappropriate for summary judgment.

> * The movant must meet the initial burden of showing "the absence of a genuine issue of material fact" as to an essential element of the non-movant's case. This burden may be met by pointing out to the court that the respondent, having had sufficient opportunity for discovery, has no evidence to support an essential element of his or her case.

> * The respondent cannot rely on the hope that the trier of fact will disbelieve the movant's denial of a disputed fact, but must "present affirmative evidence in order to defeat a properly supported motion for summary judgment."

> * The trial court no longer has the duty to search the entire record to establish that it is bereft of a genuine issue of material fact.

> * The trial court has more discretion than in the "old era" in evaluating the respondent's evidence. The respondent must "do more than simply show that there is some metaphysical doubt as to the material facts." Further, "[w]here the record taken as a whole could not lead a rational trier of fact to find" for the respondent, the motion should be granted. The trial court has at least some discretion to determine whether the respondent's claim is plausible.

*Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479–80 (6th Cir.1989). *See also Nernberg v. Pearce*, 35 F.3d 247, 249 (6th Cir.1994). The Court will apply these standards in deciding Defendant's motion for summary judgment.

## B. Plaintiff's Title VII Retaliation Claim

█ Count II of Plaintiff's Complaint asserts a retaliation claim under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.* As its first basis for seeking summary judgment, Defendant contends that Plaintiff may not pursue a Title VII claim because he failed to assert such a claim in any of the four charges he filed with the EEOC. Defendant argues that Plaintiff's claims before this Court may not exceed the scope of his complaints made to the EEOC, which did not encompass any alleged Title VII violations.

As Defendant points out, the Sixth Circuit Court of Appeals recently held that a plaintiff who alleged race discrimination and retaliation in a charge filed with the EEOC could not use that charge as a basis for filing a federal court complaint alleging

---

**10.** "Taken together the three cases signal to the lower courts that summary judgment can be relied upon more so than in the past to weed out frivolous lawsuits and avoid wasteful trials." 10A Charles A. Wright, Arthur R. Miller, Mary Kay Kane, *Federal Practice & Procedure*, § 2727, at 33 (1993 Supp.).

age discrimination. *Davis v. Sodexho, Cumberland College Cafeteria,* 157 F.3d 460 (6th Cir.1998). The Court found that a contrary result would undermine the jurisdictional requirement under federal anti-discrimination law that a plaintiff must first exhaust his administrative remedies by filing a charge of discrimination with the EEOC. The Court further observed that this exhaustion-of-remedies requirement affords the EEOC the opportunity to investigate and "attempt to obtain voluntary compliance" from the employer, as well as serving to "notify potential defendants of the nature of plaintiffs' claims and provide them the opportunity to settle the claims before the EEOC rather than litigate them." 157 F.3d at 463.

Viewed with these principles in mind, the present case does not implicate the exhaustion-of-remedies doctrine, but instead involves a simple deficiency in pleading. In the last three of his four EEOC charges, Plaintiff specifically alleged that Defendant had acted in retaliation for his prior charges, and that this retaliatory action violated the ADA. For reasons that are not clear, Plaintiff failed to cite the ADA in Count II of his Complaint, and instead alleged that Defendant's retaliatory action violated Title VII. Nevertheless, it is clear from the remainder of the Complaint and from the record that Plaintiff is seeking to pursue a retaliation claim, and that this claim is based on Defendant's alleged retaliation for Plaintiff's filing of EEOC charges in which he asserted disability discrimination claims under the ADA.

Thus, the purposes of the exhaustion-of-remedies requirement have been fully served here. The EEOC was given an opportunity to address Plaintiff's ADA-based retaliation claims, and Defendant was put on notice of the nature of and basis for those claims.[11] Although Plaintiff mistakenly characterized Count II of his

Complaint as arising under Title VII rather than the ADA, his EEOC charges sufficiently advised Defendant of the substance of his retaliation claims. Accordingly, because the ADA, like Title VII, prohibits retaliation based on the assertion of EEOC charges, *see* 42 U.S.C. § 12203(a), the Court will treat Count II of Plaintiff's Complaint as based on the ADA rather than Title VII, and will allow Plaintiff to proceed with his claim of retaliation.

**C. The Effect of Plaintiff's Settlement Agreements**

█ As its next ground for seeking summary judgment, Defendant contends that Plaintiff released his employer from any liability for his discipline and discharge in July of 1997 by agreeing at the time to settle that dispute in exchange for his reinstatement. As noted above, Defendant discharged Plaintiff on July 7, 1997, for allegedly swiping another employee's time card in violation of plant rules. However, Plaintiff was reinstated shortly thereafter, following his execution of an agreement on August 1, 1997 imposing various conditions on his further employment with Defendant. One such condition was Plaintiff's agreement that "[t]his will settle the grievance filed on your behalf ... relating to this matter, and *any and all other claims relating to said discharge.*" (Defendant's Motion, Ex. G (emphasis added).) Given this express settlement language, Defendant argues that Plaintiff may not pursue any discrimination or retaliation claims arising from his discipline, discharge and reinstatement in the summer of 1997.

The Sixth Circuit has held that agreements to settle discrimination claims are enforceable if "knowingly and voluntarily executed." *Adams v. Philip Morris, Inc.,* 67 F.3d 580, 583 (6th Cir.1995). In his response to Defendant's motion, Plaintiff did not contend that his execution of the

---

**11.** Indeed, Defendant's notice is established through its two settlement agreements with Plaintiff, which resolved the claims asserted in the first two of Plaintiff's four EEOC charges.

August 1 agreement was anything other than knowing and voluntary. At his deposition and at oral argument on Defendant's motion, however, Plaintiff claimed that Defendant obtained his signature on the agreement through unlawful coercion. In particular, Plaintiff noted at his deposition that he wrote the words "under duress" next to his signature on the August 1 agreement, (Defendant's Motion, Ex. G), and he testified that he had in fact executed the agreement "under duress or protest." (Plaintiff's Dep. at 37.) Plaintiff further testified that he understood "that this was the only way that I could get my job back," that "I was just under duress for my income purposes," and that his "under duress" notation was meant to reflect "an objection" that the allegations upon which his discharge was based were "never proven." (Plaintiff's Dep. at 38–41.)

Upon reviewing this deposition testimony, the Court finds that the "duress" cited by Plaintiff was nothing more than economic pressure of the sort held in *Adams*, *supra*, to be insufficient to demonstrate unlawful coercion. In *Adams*, as here, the plaintiff cited "extreme economic distress" as the motivating factor in his decision to sign a release. 67 F.3d at 583. Despite this claim, the Sixth Circuit concluded that Adams had knowingly and voluntarily executed the release:

> It is evident, from Adams' correspondence in the record and his supervisory experience, that he was generally knowledgeable and aware of his rights. The waiver is plain and unambiguous, and easily understandable by someone of Adams' abilities. Adams had five days in which to consider whether to sign the waiver, and was advised by [his employer] to consult with an attorney before doing so. By signing the waiver, Adams

received approximately twice as much in termination benefits than he would have been entitled to under the normal severance package plans. Although he certainly felt some economic pressure to accept the attractive severance package and settle any potential claims he might have against [his employer], this pressure does not rise to the level of economic duress. Accordingly, we hold that the release was knowingly and voluntarily executed by Adams . . . .

67 F.3d at 583.

Similarly, in the present case, the economic pressure and protestations of innocence cited by Plaintiff as the reasons for his "under duress" notation on the 1997 settlement agreement fail to establish that his execution of the agreement was anything other than knowing and voluntary. The agreement was only one page in length and set forth five clearly-worded conditions upon Plaintiff's reinstatement, one of which was that Plaintiff agreed to "settle the grievance filed on your behalf (# 97–36) relating to this matter, and any and all other claims relating to said discharge." (Defendant's Motion, Ex. G.) This language is plain and straightforward, and nothing in the record suggests that Plaintiff was unaware of its meaning, or of his rights generally, at the time he signed the agreement.[12] Nor has Plaintiff testified that he was given insufficient time to consider his options, or that Defendant placed any constraints upon his consideration of the settlement agreement that might have created an atmosphere of coercion.

To the contrary, as shown by his deposition testimony explaining the "under duress" notation he placed next to his signature, Plaintiff understood the implications of the agreement, but concluded that his

---

12. Indeed, the Court notes that Plaintiff had previously executed a settlement agreement in February of 1995 that included far more complex and comprehensive release provisions. (See Defendant's Motion, Ex. C.) Thus, Plaintiff had prior experience in reviewing settlement agreements and language of release. *See Adams,* 67 F.3d at 583 (citing the plaintiff's background and experience as factors to be considered in determining whether a release was knowingly and voluntarily executed).

signature was necessary to regain his job. He also meant the "under duress" language to reflect his protest that his discharge had been based upon allegations that he maintained were untrue. To be sure, Plaintiff's decision to sign the agreement despite these objections indicates that he felt economic pressure to settle his claims. However, if such pressure were deemed sufficient to overcome an otherwise knowing and voluntary release, it is difficult to imagine a case in which a release signed in exchange for reinstatement would ever be enforceable. In such cases, it can generally be assumed that the employee feels economic pressure to settle and regain his job. Yet, *Adams* holds that such economic pressure, standing alone, is insufficient to render a settlement agreement unenforceable. As this is the only sort of "duress" alleged by Plaintiff, the Court concludes under the totality of the circumstances that Plaintiff knowingly and voluntarily signed the August 1, 1997 agreement, and that the agreement's release provision therefore is enforceable.

Next, Plaintiff argues that the August 1, 1997 agreement does not bar a subsequent suit under the principle that a prior arbitration of a discrimination claim does not preclude its later submission to a court. *See Alexander v. Gardner–Denver Co.*, 415 U.S. 36, 47–48, 94 S.Ct. 1011, 1019, 39 L.Ed.2d 147 (1974). This principle, however, has no application to the question whether Plaintiff's settlement agreement should be enforced. As Plaintiff himself points out, the Supreme Court's decision in *Alexander* rested upon the recognition that arbitration vindicates an employee's rights as a member of a collective bargaining unit, while a Title VII suit seeks to enforce the employee's individual statutory rights. 415 U.S. at 49–50, 94 S.Ct. at 1020. This same distinction cannot be drawn here, where Plaintiff's settlement agreement addressed only his own right to pursue his individual claims. Indeed, the *Alexander* Court expressly recognized that "presumably an employee may waive his cause of action under Title VII as part of a voluntary settlement." 415 U.S. at 52, 94 S.Ct. at 1021 (footnote omitted).

This is precisely what occurred here. Accordingly, because Plaintiff knowingly and voluntarily executed the August 1, 1997 settlement agreement, and because that agreement's language and scope are clear, the Court holds that Plaintiff's claims are barred to the extent they are based on his discharge and reinstatement in July of 1997.[13]

## D. Plaintiff's Claim of Disability Discrimination

Turning to the substance of Plaintiff's claims, Defendant argues that Plaintiff has failed either to establish a *prima facie* claim of disability discrimination in violation of the ADA or to produce evidence that Defendant's stated reasons for its actions were a pretext for unlawful discrimination. As Defendant notes, the burden-shifting analysis set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802, 93 S.Ct. 1817, 1824, 36 L.Ed.2d 668 (1973), governs disability discrimination claims brought under the ADA. *See Kocsis v. Multi–Care Mgmt., Inc.*, 97 F.3d 876, 882–83 (6th Cir.1996). The *Kocsis* Court specifically addressed this framework as applied to claims of disability discrimination:

13. As noted earlier, Plaintiff executed a settlement agreement in February, 1995 releasing all claims arising from events occurring prior to the date of that agreement. (Defendant's Motion, Ex. C.) Plaintiff has not challenged the enforceability of the 1995 agreement, nor does he seek to pursue claims predating or otherwise relating to that agreement. Plaintiff also testified that he had no complaints of unfair treatment or discrimination by Defendant between his execution of the first settlement agreement in February of 1995 and his discharge in July of 1997. (Plaintiff's Dep. at 47.) Accordingly, in the remainder of this Opinion, the Court considers only those allegations of discrimination and retaliation based on events occurring after Plaintiff's 1997 discharge, reinstatement, and execution of the August 1, 1997 settlement agreement.

[A] plaintiff establishes a prima facie case of disability discrimination if she proves that (1) she was "disabled" within the meaning of the [ADA]; (2) she was qualified for the position, with or without an accommodation; (3) she suffered an adverse employment decision with regard to the position in question; and (4) a non-disabled person replaced her or was selected for the position that the disabled person had sought. If the plaintiff establishes the elements for a prima facie case, the burden then shifts to the defendant to set forth a legitimate, nondiscriminatory reason for the adverse employment action it took against the plaintiff. If the defendant carries that burden of production, plaintiff must then prove "by a preponderance of the evidence" that the defendant's proffered reasons were not its true reasons, but were merely a pretext for illegal discrimination.

97 F.3d at 882–83 (citations omitted).

### 1. Plaintiff's Claim of Discrimination in His 1998 Discharge

Applying this burden-shifting framework to Defendant's decision to discharge Plaintiff in January of 1998, Defendant argues that it is entitled to summary judgment on Plaintiff's claim of discriminatory discharge because Plaintiff has failed to produce evidence that Defendant's stated reason for its discharge decision was a pretext for disability discrimination. Defendant notes that its decision maker, Brad Hagemeyer, stated in his affidavit that his decision to discharge Plaintiff rested upon his finding that Plaintiff had threatened a co-worker, and that this violation of plant rules fully justified Plaintiff's discharge. Defendant then argues that Plaintiff has produced no evidence tending to cast doubt upon Hagemeyer's

stated reason for his decision. As discussed below, the Court agrees that the evidence marshaled by Plaintiff to challenge Defendant's stated basis for its discharge decision is insufficient as a matter of law to permit Plaintiff to proceed with his claim of discriminatory discharge.

Assuming for purposes of this motion that Plaintiff has established a *prima facie* case with respect to his 1998 discharge,[14] the Court first observes that Defendant has met its burden of identifying a legitimate, nondiscriminatory basis for its discharge decision. Specifically, Brad Hagemeyer, Defendant's Human Resources Manager, stated in his affidavit that he investigated the incident involving Plaintiff and his co-worker, Collins Pruitt, interviewed several witnesses, and ultimately concluded that "Mr. Pruitt had been truthful whereas [Plaintiff] had not." (Hagemeyer Aff. at ¶ 30.) Based on this finding, Hagemeyer "concluded that [Plaintiff] had violated Plant Rule 19 and that his discharge was warranted." (*Id.*) As Plaintiff concedes, the violation of Plant Rule 19 by threatening a co-worker, if proven, is grounds for discharge. (Plaintiff's Dep. at 78–79.)

Thus, the burden shifts to Plaintiff to show that the reasons put forward by Defendant to justify its decision "were not its true reasons, but were merely a pretext for illegal discrimination." *Kocsis*, 97 F.3d at 883. "More specifically, a plaintiff must produce enough evidence that a jury could reasonably reject the employer's explanation for its decisions." *Id. Kocsis* further explained this burden in the context of an employer's motion for summary judgment:

> To raise a genuine issue of material fact on the validity of an employer's explanation for an adverse job action, the plaintiff must show, again by a pre-

---

**14.** The Court notes the absence of any evidence that Plaintiff was replaced by a non-disabled worker. *See Kocsis,* 97 F.3d at 882 (including this as an element of a *prima facie* case). Nevertheless, the Court assumes, without deciding, that a *prima facie* case is estab-

lished through Plaintiff's testimony that he was discharged while his co-worker, Mr. Pruitt (who presumably is not disabled, though the record is silent on this point), was not disciplined.

ponderance of the evidence, either (1) that the proffered reason had no basis in fact; (2) that the proffered reasons did not actually motivate the action; or (3) that they were insufficient to motivate the action.

*Id.*

■ Having conceded that Defendant's stated reason, if accepted as its actual motivation, was sufficient to warrant his discharge, Plaintiff focuses his challenge on the first two prongs of this test for pretext. First, Plaintiff questions the factual basis for Mr. Hagemeyer's conclusion that Plaintiff had in fact threatened a co-worker. Specifically, Plaintiff denies that he threatened Mr. Pruitt, and he relies principally on Pruitt's size—roughly six-foot-two, 270 pounds—as suggesting that Pruitt could not possibly have felt threatened by anything Plaintiff might have done. (Plaintiff's Dep. at 64, 67–68.) [15]

In the recent case of *Smith v. Chrysler Corp.*, 155 F.3d 799, 806–08 (6th Cir.1998), the Sixth Circuit addressed the proper standard to apply when evaluating the factual basis for an employer's stated reason for a challenged employment decision. The employer in that case, Chrysler, urged the Court to adopt the "honest belief" approach used by the Seventh Circuit, which provides that "so long as the employer honestly believed in the proffered reason given for its employment action, the employee cannot establish pretext even if the employer's reason is ultimately found to be mistaken, foolish, trivial, or baseless." 155 F.3d at 806 (citing *Kariotis v. Navistar Int'l Transp. Corp.*, 131 F.3d 672, 676 (7th Cir.1997)). The *Smith* Court explained the reasoning behind this approach: "If the employer honestly, albeit mistakenly, believes in the non-discriminatory reason it relied upon in making its employment decision, then the employer

arguably lacks the necessary discriminatory intent." 155 F.3d at 806.

The Sixth Circuit declined to adopt the "honest belief" rule in its broadest form, concluding that its complete deference to an employer's belief, without consideration of its factual basis, was "at odds with the underlying purpose behind the [ADA]— *i.e.*, that employment actions taken regarding an individual with a disability be grounded on fact and not 'on unfounded fear, prejudice, ignorance, or mythologies.' " 155 F.3d at 806 (citation omitted). Instead, the Court chose to follow a variant of the "honest belief" rule applied in one of its prior decisions, *Pesterfield v. TVA*, 941 F.2d 437, 443–44 (6th Cir.1991). The *Smith* Court explained the showings required under this modified "honest belief" standard:

Thus, according to *Pesterfield*, in order for an employer's proffered non-discriminatory basis for its employment action to be considered honestly held, the employer must be able to establish its reasonable reliance on the particularized facts that were before it at the time the decision was made. If the employer is unable to produce such evidence to support its employment action, then the "honest belief" rule does not apply. Even if the employer is able to make such a showing, the protection afforded by the rule is not automatic. As was noted in *Pesterfield*, once the employer is able to point to the particularized facts that motivated its decision, the employee has the opportunity to produce "proof to the contrary." As one court noted in a similar context, "if the employer made an error too obvious to be unintentional, perhaps it had an unlawful motive for doing so."

In deciding whether an employer reasonably relied on the particularized facts

---

15. Plaintiff also offers a statement dated February 4, 1998 and purportedly signed by Pruitt, in which Pruitt states that he "won't feel threatened or intimidated if [Defendant] allow[s] [Plaintiff] to return to work." (Plain-

tiff's Amended Response, Ex. C.) This statement plainly has no bearing on the question whether Plaintiff actually threatened Pruitt on January 15, 1998.

then before it, we do not require that the decisional process used by the employer be optimal or that it left no stone unturned. Rather, the key inquiry is whether the employer made a reasonably informed and considered decision before taking an adverse employment action. Although courts should resist attempting to micro-manage the process used by employers in making their employment decisions, neither should they blindly assume that an employer's description of its reasons is honest. When the employee is able to produce sufficient evidence to establish that the employer failed to make a reasonably informed and considered decision before taking its adverse employment action, thereby making its decisional process "unworthy of credence," then any reliance placed by the employer in such a process cannot be said to be honestly held.

155 F.3d at 807–08 (citations omitted).

Applying this standard to the present case, the Court readily concludes that Defendant has met its burden of pointing to "particularized facts" underlying its decision, and that Plaintiff has identified no evidence tending to cast doubt upon Defendant's decisional process. The Hagemeyer affidavit produced by Defendant recites a variety of particularized facts learned by Mr. Hagemeyer during his investigation, including:

- the initial report from department manager Greg Blaszczyk on the morning of January 15, 1998, relaying Mr. Pruitt's complaint that Plaintiff had shouted at Pruitt, made threatening comments, and challenged Pruitt to "take the matter 'out to Plymouth Road,'" (Hagemeyer Aff. at ¶ 22);
- Pruitt's statements, when interviewed by Hagemeyer later that day, that

Plaintiff had confronted him, shouted "what in the fuck do you mean" or words to that effect, called him a "punk ass nigger," and challenged Pruitt to "take this down on Plymouth Road," (id. at ¶ 23);
- Pruitt's reiteration of his version of the incident at a meeting among Hagemeyer, Plaintiff, Pruitt, and a union representative, and Plaintiff's response that he had no comment, (id. at ¶ 26);
- the statements of another employee, Tammie Belt, that she had seen Plaintiff following Pruitt, and had heard Plaintiff call Pruitt a "punk ass nigger," (id. at ¶ 24);
- Plaintiff's denial in an initial interview that he had even spoken with Pruitt on the morning of the 15th, and his evasive answers and failure to either admit or deny a confrontation with Pruitt during a subsequent interview, (id. at ¶¶ 25, 28); and
- the corroborating statements of several other employees, during follow-up interviews conducted by Hagemeyer, that they had seen Plaintiff yelling at Pruitt in the parking lot, and that they had heard that Plaintiff was going to confront Pruitt that morning, (id. at ¶ 29).

These specific facts are sufficiently detailed to support Defendant's reliance on the "honest belief" rule.

Accordingly, the Court must accept Hagemeyer's honestly held belief that Plaintiff threatened Pruitt in violation of plant rules, even if the actual facts are otherwise, unless Plaintiff produces sufficient "proof to the contrary" to suggest that Defendant "failed to make a reasonably informed and considered decision." Smith, 155 F.3d at 807. Plaintiff has produced no such proof, beyond his bare denial that he threatened Pruitt.[16] However,

---

16. Plaintiff's appeal to Pruitt's size obviously has no relevance to this Court's inquiry whether Defendant's decision is supported by particularized facts, as Pruitt's size at most bears only on the subjective likelihood of Pruitt feeling threatened by Plaintiff, and not the objective question whether Plaintiff did in fact threaten Pruitt. Only this latter question is implicated in this Court's assessment of

Plaintiff offered a similar denial when questioned by Mr. Hagemeyer, and Hagemeyer has set forth in his affidavit the particularized facts that led him to reject this denial as not credible. Given this factual basis underlying Hagemeyer's conclusions, and given the lack of evidence that would tend to cast suspicion upon Hagemeyer's investigation or factual determinations, the Court finds no basis for questioning the decisional process that led to Plaintiff's discharge.

■ Apart from this factual challenge, Plaintiff also questions whether the decision to discharge him truly was motivated by his alleged violation of plant rules in the incident with Mr. Pruitt. In particular, Plaintiff contends that Defendant's stated reliance on this rule violation is belied by its alleged deviation from policy in suspending and discharging him while taking no action against Pruitt. According to Plaintiff, Defendant's standard practice is to suspend both employees involved in an altercation, pending the outcome of an investigation. (Plaintiff's Dep. at 67–68.) As proof of this purported practice, Plaintiff cites the statement of a union representative, at a meeting in Hagemeyer's office addressing the incident between Plaintiff and Pruitt, that "your guy's past practice is to suspend everybody, both parties, and do the investigation." (*Id.* at 68.)

■ This Court, however, cannot rely on such inadmissible hearsay evidence submitted in opposition to a motion for summary judgment. *See U.S. Structures, Inc. v. J.P. Structures, Inc.*, 130 F.3d 1185, 1189 (6th Cir.1997). In any event, Defendant has explained any such deviation from standard practice in this case, citing Mr. Hagemeyer's statement in his affidavit that he did not suspend Pruitt because "at no time did [Plaintiff] or any of the other employees I interviewed accuse [Pruitt] of any conduct that constituted a violation of Plant Rule 19." (Hagemeyer Aff. at ¶ 34.) Plaintiff has offered no evidence to challenge this statement.[17]

Moreover, Plaintiff has failed to identify any evidentiary basis for questioning Defendant's assertion that its discharge of Plaintiff for violating Plant Rule 19 fully comported with its treatment of other, non-disabled violators of this same rule. In his affidavit, Mr. Hagemeyer cited six other employees he has discharged for violating this plant rule, and he stated that none, to his knowledge, was a qualified person with a disability. (Hagemeyer Aff. at ¶ 37.) Five of these employees subsequently were reinstated, but the sixth was not because she, like Plaintiff, was subject to a "last chance" agreement at the time of her violation. (*Id.* at ¶ 41.) Thus, the Court concludes that Plaintiff has failed to meet his burden of producing evidence that Defendant's stated reason for discharging him is a pretext for unlawful disability discrimination.

### 2. Plaintiff's Claim of Discriminatory Working Conditions

■ Turning next to Plaintiff's claim that he suffered discrimination in work assignments and conditions on account of his disability, the Court finds that Defendant is not entitled to summary judgment on this claim. In support of this claim, Plaintiff alleges that a plant foreman, Manuel Walk, unfairly changed his job assign-

---

Defendant's stated basis for its discharge decision.

17. The only purported evidence of any threatening conduct by Mr. Pruitt is Plaintiff's testimony about Pruitt's alleged statement during the meeting with Plaintiff and Hagemeyer that "I don't want to have to bring my shit." (Plaintiff's Dep. at 65.) Again, this arguably is inadmissible hearsay. More importantly, it is evidence only of Plaintiff's subjective belief that he was being threatened. There is no evidence that Mr. Hagemeyer heard this comment or had it brought to his attention by Plaintiff, nor that Hagemeyer would have understood it as a threat against Plaintiff. Absent such evidence, Pruitt's alleged statement does not undermine the factual basis for Defendant's discharge decision, nor does it call into question Defendant's stated motivation for its decision.

ments, monitored his breaks, and required him to produce his disability restriction papers every day, and that Mr. Hagemeyer failed to take action against these practices. (Plaintiff's Dep. at 52–55, 57–58.) Plaintiff also testified that, on one particular occasion in September of 1997, Mr. Walk demanded that Plaintiff produce his restriction papers or "get your ass out of here," and that Walk stated that he did not "need no man here with no one God damn hand, anyway." (*Id.* at 55.)

■ Although Plaintiff has failed to produce evidence that other non-disabled employees were not so treated,[18] he nevertheless can recover under a theory of intentional discrimination. To establish a claim of intentional discrimination, Plaintiff must show that (1) he was a member of a protected class, (2) he was subject to an adverse employment action, and (3) the person responsible for the employment decision was (a) predisposed to discriminate against persons in the protected class and (b) actually acted on that predisposition in the employment action at issue. *See Perkins v. Regents of University of Michigan,* 934 F.Supp. 857, 863 (E.D.Mich.1996).

Plaintiff's testimony as to Mr. Walk's statements and his imposition of unfavorable work assignments and conditions on Plaintiff suffices to establish an issue of fact, and thus precludes summary judgment on this portion of Plaintiff's discrimination claim. Defendant offers no evidence to refute this testimony. Nor does Defendant point to any legitimate nondiscriminatory reason for the conditions allegedly imposed on Plaintiff's employment by its foreman, Mr. Walk, or to any corrective action it took in response to Walk's alleged actions. Accordingly, the Court holds that Defendant is not entitled to summary judgment on that portion of Plaintiff's discrimination claim arising from Defendant's allegedly improper treatment of Plaintiff between his reinstatement in August of 1997 and his discharge in January of 1998.

### E. Plaintiff's Retaliation Claim

■ In addition to alleging that Defendant discriminated against him on account of his disability, Plaintiff also alleges that Defendant unlawfully retaliated against him after he filed EEOC charges complaining of Defendant's discrimination. As its final basis for seeking summary judgment, Defendant contends that Plaintiff has failed to set forth a *prima facie* case of retaliation. The Court agrees.

■ In order to establish a *prima facie* case of retaliation, Plaintiff must show that (1) he engaged in protected activity, (2) Defendant knew of this protected activity, (3) thereafter, Defendant took adverse employment action, and (4) there was a causal connection between the protected activity and the adverse action. *Allen v. Michigan Dep't of Corrections,* 165 F.3d 405, 412 (6th Cir.1999). With respect to his discharge, Plaintiff has satisfied the first three elements of this test, as there is no dispute that Mr. Hagemeyer knew of Plaintiff's prior EEOC charges by the time he made the decision to discharge Plaintiff in January of 1998. As to the fourth element, however, the Court finds no evidence of a causal connection between Plaintiff's EEOC charges and his discharge.

The necessary causal connection may be established through production of evidence "from which an inference can be drawn that the adverse action would not have been taken had the plaintiff not filed a discrimination action." *Allen,* 165 F.3d at 413. As discussed in the Court's analysis of Plaintiff's discrimination claim, nothing in the evidentiary record refutes Mr. Hagemeyer's statement that he discharged Plaintiff upon concluding, after an investigation, that Plaintiff had violated a plant rule by threatening a co-worker. Just as Plaintiff has produced no evidence that Mr. Hagemeyer's stated basis for his discharge decision was a pretext for discrimination, Plaintiff similarly has produced no

---

**18.** Plaintiff suggested at his deposition that one co-worker, Joanne Moore, was given favorable treatment, but he further stated his belief that Ms. Moore, like him, had work restrictions on account of her limited use of both hands. (Plaintiff's Dep. at 49–51.)

evidence that it was a pretext for unlawful retaliation, or that Hagemeyer's actions were in any way influenced by Plaintiff's prior EEOC charges. The Court further notes that any possible inference of a causal link is undercut by the passage of several months between Plaintiff's third EEOC filing in September of 1997 and his discharge in January of 1998. *See, e.g., Cooper v. City of North Olmsted,* 795 F.2d 1265, 1272 (6th Cir.1986) (no causal link between filing of civil rights charge and plaintiff's discharge where charge was filed four months before discharge).

 Turning to Plaintiff's allegation that Defendant imposed unfair work conditions in retaliation for his EEOC ·filings, the Court finds that this portion of Plaintiff's retaliation claim fails at the second step of the four-part test set forth above: namely, that the employer must have knowledge of his protected activity. *Allen,* 165 F.3d at 412. Simply stated, there is not one shred of evidence that Manuel Walk or any other supervisor knew of Plaintiff's complaints to the EEOC at the time they allegedly subjected Plaintiff to unfair treatment. Plaintiff concedes as much, (Plaintiff's Dep. at 56), but responds that there is no evidence that Mr. Walk did *not* know of Plaintiff's EEOC charges. Since the burden of showing such knowledge rests upon Plaintiff, *see Allen,* 165 F.3d at 412, this attempt to shift the burden to Defendant must fail.[19]

## IV. *CONCLUSION*

For the reasons set forth above,

IT IS HEREBY ORDERED that Defendant's Motion for Summary Judgment is GRANTED IN PART and DENIED IN PART. Summary judgment is granted to

Defendant with respect to Plaintiff's claims of retaliation and disability discrimination, with the exception that Plaintiff may go forward with that portion of his disability discrimination claim arising from Defendant's allegedly improper treatment of Plaintiff on the job during the period from August, 1997 until his discharge in January, 1998.

---

19. In any event, even assuming Walk knew of Plaintiff's EEOC filings, there is no direct evidence of a causal connection between this knowledge and his alleged mistreatment of Plaintiff. Although Plaintiff contends that the close proximity in time between his EEOC filings and Walk's conduct gives rise to an inference of a causal connection, *see Leslie v. St. Vincent New Hope, Inc.,* 916 F.Supp. 879, 888–89 (S.D.Ind.1996), this Court is aware of no case holding that proximity in time alone, without other surrounding circumstances, is sufficient to permit this inference. *See Booker v. Brown & Williamson Tobacco Co.,* 879 F.2d 1304, 1314 (6th Cir.1989) ("[T]he mere fact that an adverse employment decision occurs after a charge of discrimination is not, standing alone, sufficient to support a finding that the adverse employment decision was in retaliation [for] the discrimination claim.")