·**Mumtaz NIZAMI, Plaintiff,**

v.

**PFIZER INC., Defendant.**

**No. 99–73337.**

United States District Court, E.D. Michigan, Southern Division.

July 31, 2000.

Paul E. Robinson, Northville, MI, for Plaintiff.

Rachele L. Szot, Detroit, MI, for Defendant.

## OPINION AND ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

ROSEN, District Judge.

### I. INTRODUCTION

Plaintiff Mumtaz Nizami commenced this employment discrimination suit in Oakland County Circuit Court, State of Michigan on May 26, 1999, alleging that his employer, Defendant Pfizer Inc., unlawfully failed to promote him and demoted him on account of his age and national origin. Plaintiff's complaint includes two state-law counts arising under Michigan's Elliott–Larsen Civil Rights Act ("Elliott–Larsen"), Mich. Comp. Laws § 37.2101 *et seq.* On July 2, 1999, Defendant removed the case to this Court, citing the parties' diversity of citizenship. *See* 28 U.S.C. §§ 1332(a), 1441(a).

By motion filed on April 14, 2000, Defendant now moves for summary judgment in its favor on both counts of Plaintiff's complaint. In support of this motion, Defendant argues that certain of Plaintiff's failure-to-promote claims are time-barred, that Plaintiff has failed to establish a *prima facie* case of age or national origin discrimination as to his remaining claims, and that Plaintiff has not produced evidence to rebut Defendant's stated, non-discriminatory reasons for its employment decisions. Plaintiff filed an untimely response in opposition to this motion on May 24, 2000, and Defendant filed a reply in further support of its motion on June 2, 2000.

On June 29, 2000, the Court heard oral argument on Defendant's motion. Having considered the arguments of counsel at the June 29 hearing, and having reviewed the briefs and supporting materials submitted by the parties, the Court is now prepared to rule on this motion. This Opinion and Order sets forth the Court's rulings.

### II. FACTUAL BACKGROUND

#### A. The Parties

Plaintiff Mumtaz Nizami is fifty-nine years old, was born in India, and was raised in Pakistan. He was hired by Defendant Pfizer Inc., a major pharmaceutical company, on May 14, 1989, and initially was employed as a Pharmaceutical Sales Representative. In 1990, he was promoted to the position of District Hospital Representative, and in 1994, he was again promoted to the position of District Hospital Consultant.[1] Plaintiff also won a variety of awards between 1990 and 1996 for his outstanding sales performance. (*See* Plaintiff's Response, Ex. B, Plaintiff's Aff. at ¶ 7 (listing honors).) Effective January 1, 1998, however, Plaintiff was demoted to the position of Pharmaceutical Sales Representative, and he apparently remains employed with Defendant in that capacity.

#### B. Plaintiff's Requests for Promotions

Throughout Plaintiff's employment with Defendant, he has sought a variety of promotions. In a document provided to Defendant during discovery, Plaintiff has identified over a dozen instances between 1990 and 1998 where he sought a promotion but the position was awarded to someone else.[2] (*See* Defendant's Motion for Summary Judgment, Ex. Q.) In addition, Plaintiff testified at length at his deposition regarding his unsuccessful efforts to secure these promotions. Broadly speaking, these efforts can be characterized as falling into two categories.

---

1. This position is now known as Institutional Hospital Representative ("IHR"). At oral argument, the parties disputed whether Plaintiff's second promotion occurred in 1992 or 1994. In their briefs, however, both parties stated that Plaintiff was promoted in 1994. (*See* Defendant's Motion, Br. in Support at 1; Plaintiff's Response Br. at 3.)

2. At his deposition, Plaintiff testified that he ceased to apply for promotions once he filed this suit in the spring of 1999, because he "didn't see any hope with the company." (Defendant's Motion, Ex. P, Plaintiff's 2/21/00 Dep. at 182.)

First, in seven cases, Plaintiff learned that a specific position had become available and actively sought this position.[3] Most of these positions were within the Great Lakes region in which Plaintiff was employed, but one was in Brooklyn, New York, and another was in California. Nevertheless, Plaintiff indicated to management that he would be willing to relocate in order to obtain a promotion. (Plaintiff's Response, Ex. B, Plaintiff's Aff. at ¶ 15.) Plaintiff was interviewed for three of these seven positions, but the remaining positions were filled without granting Plaintiff an interview. According to Plaintiff, five of these positions were filled by younger white or Hispanic individuals, while the other two were awarded to black employees. Plaintiff testified that these challenged decisions were made by five individuals: (1) John Kresl, his immediate supervisor until 1996; (2) Larry Yarcheck, the Regional Manager for Defendant's Roerig Division in the Great Lakes region; (3) Forest Harper, a Regional Manager in New York; (4) Mark Burns, a District Manager in Defendant's Powers Division; and (5) Margaret Yan, a District Manager in San Francisco.

In the remaining cases, Plaintiff alleges that he was unlawfully denied promotions to positions that were created as a result of Defendant's corporate expansions. Again, some of these openings occurred in the Detroit area, while others were scattered throughout the country. Plaintiff was interviewed in connection with two of these expansions, but was not granted interviews in several other instances. Plaintiff does not have first-hand knowledge of all of the individuals who were selected for these positions. Nevertheless, based on seeing pictures of the selected employees in company magazines, as well as his personal opinion and experience of Defendant's hiring practices, Plaintiff believes that roughly 98 percent of these positions were filled by younger white individuals. (Plaintiff's 2/21/00 Dep. at 259, 261, 266, 269, 275–76, 287–88, 295.)

At his deposition, Plaintiff identified three bases for his belief that Defendant was motivated by impermissible considerations of age and ethnicity in its selection of individuals for promotion. First, he charged that three particular individuals— John Kresl, Larry Yarcheck, and Forest Harper—were guilty of impermissible bias in their employment decisions. Plaintiff opined that "it was a general philosophy for Mr. Kresl to promote younger people," and he also concluded that Kresl's decisions were attributable to bias on account of Plaintiff's race. (Plaintiff's 2/21/00 Dep. at 252–53.) Regarding Larry Yarcheck, Plaintiff testified that "Mr. Yarcheck's policy has always been to select white Caucasian males and Mr. Yarcheck's policy has always been to select younger people for the positions that he always filled during his tenure as regional manager and his record shows that very clearly." (*Id.* at 194.) As to Forest Harper, an African American, Plaintiff stated that Harper promoted a black individual rather than Plaintiff because he "wanted to award one of his own people," and that "[i]t has been Mr. Harper's inclination throughout his executive position ... that he has always tried to reward his people." (*Id.* at 219, 221.) Plaintiff, however, has produced no direct evidence of any of these alleged biases, such as statements evincing a race- or age-based animus.

Next, Plaintiff surmises that Defendant's employment decisions must have been discriminatory, because Plaintiff has seldom been advised of any legitimate ba-

---

**3.** Prior to 1996, Defendant apparently did not post its job openings, and there was no formal mechanism in place for an employee to "apply" for an open position. Instead, if Plaintiff desired a promotion, he would express his interest to his supervisor, who would then relay this information to the individual in charge of hiring for this position. (Plaintiff's 2/21/00 Dep. at 184–85.) Beginning in 1996, the company posted job opening on its e-mail system, and Plaintiff submitted written applications for any positions in which he was interested. (*Id.*)

sis for these decisions. According to Plaintiff, in many instances, his personnel record has equaled or exceeded the records of those who were selected for promotion. Thus, when these individuals with allegedly weaker records were promoted instead of Plaintiff, he concluded that the true reasons for Defendant's decisions were national origin and age discrimination. (*See* Plaintiff's 2/21/00 Dep. at 223, 250–52.) Plaintiff conceded, however, that he lacked first-hand knowledge of the evaluations received by these other employees or their overall personnel records, and at best knew only of their sales performance, which comprises only a portion of an employee's record. (*See id.* at 203, 207–08, 220, 223, 237–39, 250–52, 282.)

Finally, at some point in his employment with Defendant, Plaintiff began to conclude that Defendant's past practice of allegedly discriminatory decisionmaking rendered any subsequent decisions inherently suspect. For example, when Plaintiff was not given a position he sought in California in late 1998, he was told by the California District Manager, Margaret Yan, that "the person she elected better suited her needs." (*Id.* at 292.) Despite this assurance, Plaintiff "very firmly and strongly believe[d] that that was not really the fact," and that the decision instead rested upon impermissible considerations of age and ethnicity, based on his "past experience of applying for the promotions and not being given a chance." (*Id.* at 292, 295.)[4] Similarly, on another occasion in 1998, Plaintiff concluded that Defendant's failure to promote him was attributable to his national origin and age, because "this has been now up to this point almost past ten years attitude and record of the company not to consider me for any pro-

motion," and because, over this period, "almost 98 percent of the people that had been promoted in ... the positions I interviewed for, [or] indicated interest for promot[ion], were younger people." (*Id.* at 287–88.)

## C. The Events Leading to Plaintiff's Demotion

From the date Plaintiff was hired in 1989 until late 1996, John Kresl was Plaintiff's supervisor. During this period, Plaintiff consistently achieved ratings of "good," "superior," or "outstanding" on his performance reviews. (Plaintiff's Aff. at ¶ 10; *see also* Plaintiff's Response, Ex. V (collecting reviews).) Moreover, as noted earlier, Plaintiff received a variety of awards for his sales performance, as well as several letters from management and from clients recognizing his achievements. (*See* Plaintiff's Response, Ex. F (collecting letters).)[5]

In 1995, however, Plaintiff began receiving notices of deficiencies in "starter administration." Part of Plaintiff's job as a pharmaceutical sales representative was to distribute drug samples to physicians. Both Defendant and the federal Food and Drug Administration ("FDA") carefully monitor and regulate the inventories of such drug samples,[6] and Plaintiff, like other sales representatives, was required to submit periodic reports of his sample inventory to Defendant's "starter administration" group. On April 3, 1995, Plaintiff received an e-mail notice from this group indicating that he had failed to reconcile 20.34 percent and 11.45 percent variances in two inventory reports he had filed in 1994, reminding Plaintiff that these variances exceeded Defendant's acceptable margin of plus-or-minus five percent, and

---

**4.** Plaintiff also testified that, in his opinion, this decision was based in part on a "negative and derogatory letter" placed in his file by Larry Yarcheck, recommending his demotion in late 1997. (*Id.* at 292.)

**5.** In his response to Defendant's motion, Plaintiff also has submitted affidavits from four client physicians, vouching for Plaintiff's

skills as a pharmaceutical sales representative. (*See* Plaintiff's Response, Exs. P, Q, R, S.)

**6.** According to Defendant, significant variances in inventory must be reported to the FDA.

cautioning that these matters would be brought before the "Starter Task Force Committee" if Plaintiff failed to promptly resolve them. (Defendant's Motion, Ex. B.)[7]

In August of 1996, Plaintiff was placed on an "Immediate Action Plan" as a result of his supervisor's determination that his "sample administrative duties have been neglected far too long." (Defendant's Motion, Ex. C.) Under this plan, Plaintiff was required to maintain his sample inventory on the computer on a daily basis, and to send hard copies of this inventory to the starter administration group each Friday. (*Id.*) Kresl further advised Plaintiff that his "activities w[ould] be keenly monit[o]red until the end of this semester." (*Id.*)

In late 1996, Julie Williams replaced John Kresl as Plaintiff's direct supervisor. As Plaintiff testified at his deposition, his relationship with his new supervisor quickly deteriorated, and Larry Yarcheck summoned Plaintiff and Williams to two meetings in Chicago to urge them to improve their communication and cooperation. (*See* Plaintiff's 1/21/00 Dep. at 113–16.) During this period, Plaintiff continued to receive warnings about his deficiencies in sample administration. On January 21, 1997, Yarcheck wrote to Plaintiff:

> Since early 1996, you have had issues with sampling physicians appropriately, recording the same and adhering to Pfizer's Sampling Policy and Procedures. In communications forwarded to the Regional Office from our Sample Administrator, you have been outside acceptable variances the majority of 1995–96.
>
> Sampling is an important part of our representatives['] day-to-day job duties as is the proper administrative responsibilities. This past year, you have had

major reconciliation issues with your sample inventories and sample documentation as well as a lack of response to the requests for correction from the Sample Administrator. The sample problem must be corrected immediately.

> Until further notice, you must enter sample sheets into your computer on a daily basis and send the white copies to your District Manager at the end of *each week* . . . .
>
> \*   \*   \*   \*   \*   \*
>
> Effective immediately, we expect you to adhere to all good practices of sampling and to all aspects of Pfizer's Sampling Policy which you have signed. Failure to do this could lead to loss of annual bonus, merit salary increases and potential termination.

(Defendant's Motion, Ex. D.) Plaintiff signed this letter to acknowledge that he understood its contents. (*Id.*) In addition, at his deposition, Plaintiff conceded that the substance of this letter was true regarding his sampling problems since early 1996 and his failure to maintain inventory variances within acceptable limits in 1995 and 1996. (Plaintiff's 2/21/00 Dep. at 335.)

In March of 1997, Julie Williams placed Plaintiff on a second "Immediate Action Plan," again citing Plaintiff's need to "improve his planning and organization," and noting that he was "consistently out of variance with his samples." (Defendant's Motion, Ex. E.) This latest plan again called for Plaintiff to maintain a daily record of his samples, and to submit forms to the administration on a weekly basis. Plaintiff responded with a letter conceding that "I need improvement in my p[la]nning and organization." (Defendant's Motion, Ex. G.)

Despite this acknowledgment of management's concern, Plaintiff apparently failed to improve his performance in this

---

**7.** The copy of this e-mail produced by Defendant as an exhibit to its motion includes a handwritten note from "Larry" (apparently Larry Yarcheck, Plaintiff's second-line manager) to "John" (apparently John Kresl, Plain-

tiff's direct supervisor), stating that "I know that [Plaintiff] is weak in admin[istration]," and that "[i]f he wants to be considered for promotions, he needs to take serious action in correcting this challenge." (*Id.*)

area. Rather, on July 24, 1997, Defendant's Vice President of Sales, Forest Harper, sent Plaintiff a letter stating:

> Today, the USP Starter Administration Task Force reviewed your sample transactions activities for the past 12 months and determined that you have been grossly negligent in entering your samples in a timely manner, thereby causing variances accounted at a value in excess of *$230,800*. You have been contacted on numerous occasions to correct variances, enter sample transactions and mail appropriate forms, however you have chosen to ignore the authority of contacts from Starter Administration, District Managers to your Regional Manager. Starter sample reports through the first quarter of 1997 show that you continue to refuse to enter your sample transactions. *Taz, this type of behavior and disrespect is unacceptable and will not be tolerated.*
>
> \*   \*   \*   \*   \*   \*
>
> It is the Corporation's responsibility to report all such variances to the FDA and actions against violators. Clearly, you are in violation of USP and FDA Policies that require accurate and timely recording of Starters.
>
> \*   \*   \*   \*   \*   \*
>
> Since you have failed to successfully complete [your] Immediate Action Plan for this behavior, you will forfeit your 1997 semester Bonus and Business Plan. You will be temporarily suspended from the second semester Incentive Plan until you have successfully completed PIP [*i.e.*, a Performance Improvement Plan]. Your District Manager will conduct monthly inventories of your starters. If at the end of the 60 days you have not improved and completed the plan you will be placed on final *probation,* which could lead to your *dismissal.*

(Defendant's Motion, Ex. I.)

Apart from this issue of sample administration, Plaintiff's new supervisor, Julie Williams, identified other deficiencies in Plaintiff's performance during a March 1997 performance review. First, she rated Plaintiff's performance as "needs improvement" or "unacceptable" in four areas, including planning and organization. (Defendant's Motion, Ex. E.) Next, Williams stated that Plaintiff was "consistently late with all paper work," that his presentations to physicians and co-workers were deficient in various respects, that Plaintiff was "inflexible and does not listen," and that "[w]hen given instructions on how to do something he argues [and] makes excuses as to why the task cannot be achieved." (*Id.*) Thus, Williams imposed another Immediate Action Plan which, in addition to addressing the variances in sample inventory, also required Plaintiff to prepare and submit weekly itineraries, to attend an internal seminar in communications, and to listen to Williams' instructions and "adjust [his] activities without excuses." (*Id.*)

In a letter to Plaintiff dated March 18, 1997, Williams cited additional reasons for placing him on this latest Immediate Action Plan, including his failure to attend a dinner function with client physicians, his failure to ensure that a physician was promptly paid for a lecture, and a complaint received from still another physician that Plaintiff had not called on him in four months. (Defendant's Motion, Ex. F.) Williams stated that "[a]ll of this behavior is unacceptable," and warned that Plaintiff would be placed on probation if he failed to "strictly adhere" to the plan. (*Id.*)

Over the next few months, two managers, Williams and Tim Bowling, accompanied Plaintiff on two separate occasions as he called on physicians. In his report of his outing with Plaintiff, Bowling rated Plaintiff as "below average" or "unacceptable" in the areas of itinerary, rapport and credibility, and clinical knowledge and presentation skills. (Defendant's Motion, Ex. H.) For her part, Williams rated Plaintiff as "below average" in the areas of itinerary, rapport and credibility, and pre-call planning. (Defendant's Motion, Ex. J.)

In her next review of Plaintiff's performance in August of 1997, Williams acknowledged Plaintiff's significant accomplishments in sales performance, including his leading status in the region in sales of Zoloft. (Defendant's Motion, Ex. K.) She also noted that Plaintiff had reconciled the variances in his sample inventory, albeit only after he was repeatedly asked to comply, and after being summoned to meet with Defendant's Vice President of Sales, Forest Harper. (Id.)[8] She complained, however, that Plaintiff was "consistently late with most assignments and meeting deadlines," that he did not know the chief medicine residents at a hospital where he had been assigned since November of 1996, that he failed to regularly communicate with Williams or respond to her e-mails, that he occasionally stormed out of meetings with Williams, and that he "argues when given assignments and gives excuses why things are not completed on a timely basis." (Id.) Accordingly, Williams rated Plaintiff as "needs improvement" or "unacceptable" in four areas, and she continued him on an Immediate Action Plan until the end of 1997.

In December of 1997, Plaintiff's second-line manager, Larry Yarcheck, spent a day accompanying Plaintiff on his sales calls, and concluded that Plaintiff had failed to work cooperatively with his supervisor or to successfully carry out his most recent Immediate Action Plan. Thus, on December 8, 1997, Yarcheck wrote to Forest Harper, recommending that Plaintiff be demoted:

As per many feedback discussions regarding Taz N[i]zami's performance, or lack of, in the field as well as his refusal to work coordinately with his District Manager and follow his immediate action plan, I spent a day in the field this past week with Taz and my enclosed write-up describes numerous areas of improvement that have not been accomplished.

What is particularly discerning is the fact that the feedback presented by Julie William[ ]s, . . . Tim Bowling and myself all support the same conclusion that Taz is ineffective in managing the skills and tasks necessary [for] being a successful IHR.

With very specific direction from myself of working a day in the field to see specifically what Taz does on a routine basis, he was deficient in a number of areas, especially those for a Representative with so much tenure. We had a weak itinerary for calling on key people, which was not used during the day; no clinics were visited, no residents paged, no units visited etc. during the entire day. The selling message for a surgical lunch was weak and focused on fungal infections vs. presumptive therapy. Competitive products were being used quite frequently and Taz did not seem to know why, how long it was going on or who could best put a stop to it! The director of surgery has given him carteblanc to contact his residents to support our message yet little has been done to accomplish this goal. It was a very disappointing day, and one where many of the same ideas have already been passed along to Taz and he has chosen not to implement [them].

It is with this feedback and observation that I recommend [that] Taz N[i]zami be demoted to the PHR level and offered a territory in the Great Lakes Region of Roerig [a division of Defendant], effective immediately.

(Defendant's Motion, Ex. N.) Defendant adopted Yarcheck's recommendation, and Plaintiff was demoted to the position of Pharmaceutical Sales Representative, effective December 12, 1997.[9] This lawsuit

---

8. According to Plaintiff, his sample variance was reduced to zero as of October 1, 1997, and remained at zero throughout 1998. (Plaintiff's Response, Ex. B, Plaintiff's Aff. at ¶ 29.)

9. Plaintiff testified at his deposition that this demotion did not result in a reduction in base pay or benefits, but that it decreased his annual bonus pay by several thousand dollars, and that he suffered losses in status and in

followed, challenging both Defendant's decision to demote Plaintiff and its repeated failures to grant the promotions sought by Plaintiff.

### III. *ANALYSIS*

#### A. The Standards Governing Defendant's Motion

Through its present motion, Defendant seeks an award of summary judgment in its favor on both counts of Plaintiff's complaint. Under the relevant Federal Rule, summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c).

Three 1986 Supreme Court cases—*Matsushita Electrical Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986), *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986), and *Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)—ushered in a "new era" in the federal courts' review of motions for summary judgment. These cases, in the aggregate, lowered the movant's burden in seeking summary judgment.[10] According to the *Celotex* Court:

> In our view, the plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof.

*Celotex*, 477 U.S. at 322, 106 S.Ct. 2548.

After reviewing the above trilogy, the Sixth Circuit adopted a series of principles governing motions for summary judgment. These principles include:

* Cases involving state of mind issues are not necessarily inappropriate for summary judgment.

* The movant must meet the initial burden of showing "the absence of a genuine issue of material fact" as to an essential element of the non-movant's case. This burden may be met by pointing out to the court that the respondent, having had sufficient opportunity for discovery, has no evidence to support an essential element of his or her case.

* The respondent cannot rely on the hope that the trier of fact will disbelieve the movant's denial of a disputed fact, but must "present affirmative evidence in order to defeat a properly supported motion for summary judgment."

* The trial court no longer has the duty to search the entire record to establish that it is bereft of a genuine issue of material fact.

* The trial court has more discretion than in the "old era" in evaluating the respondent's evidence. The respondent must "do more than simply show that there is some metaphysical doubt as to the material facts." Further, "[w]here the record taken as a whole could not lead a rational trier of fact to find" for the respondent, the motion should be granted. The trial court has at least some discretion to determine whether the respondent's claim is plausible.

*Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479–80 (6th Cir.1989). *See also Nernberg v. Pearce*, 35 F.3d 247, 249 (6th Cir.1994). The Court will apply these standards in resolving Defendant's motion.

#### B. Plaintiff's Claim of Discriminatory Demotion

As discussed above, Plaintiff's complaint challenges both Defendant's December

---

future income potential. (Plaintiff's 2/21/00 Dep. at 299–302.)

**10.** "Taken together the three cases signal to the lower courts that summary judgment can be relied upon more so than in the past to weed out frivolous lawsuits and avoid wasteful trials." 10A Charles A. Wright, Arthur R. Miller, Mary Kay Kane, *Federal Practice & Procedure*, § 2727, at 33 (1993 Supp.).

1997 decision to demote him from Institutional Hospital Representative ("IHR") to Pharmaceutical Sales Representative, and Defendant's repeated denials of promotions sought by Plaintiff from 1990 through 1998. Plaintiff alleges that Defendant improperly based these employment decisions on impermissible considerations of age and national origin. These challenges are brought exclusively under Michigan's Elliott–Larsen Civil Rights Act ("Elliott–Larsen"), Mich. Comp. Laws § 37.2101 *et seq.*, and not under its federal counterparts also prohibiting discrimination on account of age, *see* 29 U.S.C. § 623, and national origin, *see* 42 U.S.C. § 2000e–2.

Nonetheless, the parties agree that this Court may look to cases arising under both Elliott–Larsen and its federal counterparts in addressing Plaintiff's claims. *See, e.g., Matras v. Amoco Oil Co.*, 424 Mich. 675, 385 N.W.2d 586, 589 (1986) (looking to federal decisions in deciding a claim of age discrimination under Michigan law); *McDonald v. Union Camp Corp.*, 898 F.2d 1155, 1159 (6th Cir.1990) (same). In particular, where there admittedly is no direct evidence that the challenged decisions in this case were based on Plaintiff's age or national origin, the Court will apply the tripartite burden-shifting regime set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802, 93 S.Ct. 1817, 1824, 36 L.Ed.2d 668 (1973). *See Town v. Michigan Bell Tel. Co.*, 455 Mich. 688, 568 N.W.2d 64, 67–68 (1997); *Meagher v. Wayne State Univ.*, 222 Mich.App. 700, 565 N.W.2d 401, 410 (1997), *lv. app. denied*, 457 Mich. 874, 586 N.W.2d 919 (1998).

■ With these general principles in mind, the Court turns first to Plaintiff's claims that his age and/or national origin were impermissible factors in Defendant's decision to demote him from his IHR position in December of 1997. Under the *McDonnell Douglas* framework, Plaintiff bears the initial burden of establishing a *prima facie* case of unlawful discrimination. This *prima facie* case consists of four elements: (1) that Plaintiff is a member of a protected class; (2) that he suffered an adverse employment action; (3) that he was qualified for the position; and (4) that he was treated differently from employees outside his class or from younger employees for the same or similar conduct. *See Lytle v. Malady*, 458 Mich. 153, 579 N.W.2d 906, 914, 916 (1998); *Town*, 568 N.W.2d at 68. More generally, it is Plaintiff's burden at this initial stage to identify circumstances surrounding his demotion that give rise to an inference of unlawful discrimination. *Lytle*, 579 N.W.2d at 914; *Wilcoxon v. Minnesota Mining & Mfg. Co.*, 235 Mich.App. 347, 597 N.W.2d 250, 256 (1999).

In its motion, Defendant challenges the third element of Plaintiff's *prima facie* case, arguing that Plaintiff was rendered "unqualified" for his position as an IHR by virtue of the various shortcomings in his job performance in 1996 and 1997 as identified by his supervisors. In support of this contention, Defendant cites the Sixth Circuit's decisions in *McDonald, supra,* 898 F.2d at 1160, and *Ang v. Procter & Gamble Co.*, 932 F.2d 540, 548–49 (6th Cir.1991), in which the Court held that the plaintiff employees had failed to establish the "qualified" prong of their *prima facie* cases where their employers had produced evidence that they had not been performing at a level that would meet the employers' legitimate expectations. In this case, Defendant points to Plaintiff's neglect of his sample administration duties, as well as various evaluations criticizing Plaintiff's planning and itineraries for his hospital visits, admonishing him for failing to timely submit reports, and questioning his ability to work effectively and cooperatively with his supervisor. Based on these deficiencies in Plaintiff's performance as an IHR, Defendant asserts that Plaintiff was not qualified for this position, and hence has failed to make out a *prima facie* case of discrimination.

■ In its recent decision in *Cline v. Catholic Diocese of Toledo*, 206 F.3d 651, 660–66 (6th Cir.2000), however, the Sixth Circuit cautioned that the courts must not use the "qualified" element of the *prima facie* case to heighten the plaintiff's initial burden. In an effort to ensure that the first two stages of the *McDonnell Douglas* inquiry remain analytically distinct, and that a plaintiff's initial burden not be too onerous, *Cline* requires that the "qualified" prong of the *prima facie* case be evaluated in light of the plaintiff's employment record "*prior to* the onset of the events that the employer cites as its reason" for its decision. 206 F.3d at 662–63. Moreover, the Sixth Circuit instructed that the legitimate nondiscriminatory reason offered by the employer at the second stage of the *McDonnell Douglas* inquiry may not be considered in determining whether the employee has produced sufficient evidence to establish a *prima facie* case. 206 F.3d at 660–61.[11]

11. Although *Cline* endeavors to reconcile this holding with the Sixth Circuit's prior decisions in *McDonald* and *Ang, see Cline,* 206 F.3d at 664 n. 8, this Court is not altogether persuaded that these cases can be harmonized. Further, this Court is concerned that *Cline* unduly places the initial burden on the defendant employer, and not the plaintiff, in cases where the employer's reason for acting happens to coincide with the "qualified" element of the *prima facie* case. In this circumstance, *Cline* seemingly precludes the employer from arguing in a motion for summary judgment that the employee has no evidence to sustain the "qualified" prong of his *prima facie* case, because this argument, in *Cline's* view, would improperly inject a "second-stage" issue—the employer's legitimate reason—into the first stage of the *McDonnell Douglas* inquiry. Even where the "qualified" issue is entirely straightforward—say, for example, a case where an employer fails to promote an employee who lacks a necessary college degree—*Cline* prohibits any consideration of this issue at the *prima facie* stage, and requires that a court ask only whether the employee was qualified for the position he held before seeking the promotion.

The Court sees no reason why the parties' proofs should be so rigidly compartmentalized. In fact, the Supreme Court has repeatedly expressed its disapproval of this practice. *See Reeves v. Sanderson Plumbing Prods., Inc.,* —— U.S. ——, ——, 120 S.Ct. 2097, 2106, 147 L.Ed.2d 105 (2000) (explaining that, in the pretext stage, "the trier of fact may still consider the evidence establishing the plaintiff's prima facie case"); *Texas Dep't of Community Affairs v. Burdine,* 450 U.S. 248, 255 n. 10, 101 S.Ct. 1089, 1095 n. 10, 67 L.Ed.2d 207 (1981). By forbidding the employer's introduction of issues into the *prima facie* inquiry if they will again be raised at the second stage, *Cline* imposes a restriction on the defendant that, under *Reeves* and *Burdine,* may not be imposed on the plaintiff.

Moreover, the "cure" fashioned by *Cline* arguably is worse than the perceived "disease" of elevating the plaintiff's initial burden. Simply stated, it is difficult to imagine a case where an employee could not satisfy the "qualified" element as defined in *Cline.* In both demotion and failure-to-promote cases, for example, the employee presumably will almost always be able to identify *some* earlier point in time at which his job performance was satisfactory. Yet, such dilution of an element of the *prima facie* case defeats the whole purpose of this first stage of the *McDonnell Douglas* inquiry, which is, after all, to "create[ ] a presumption that the employer unlawfully discriminated against the employee" by "eliminat[ing] the most common nondiscriminatory reasons" for the employer's action. *Burdine,* 450 U.S. at 254, 101 S.Ct. at 1094. If the plaintiff clearly lacks necessary qualifications at the time the employer makes its decision—for example, returning to the earlier hypothetical, if the employer promotes an individual with a college degree over the plaintiff who does not—it is difficult to see how the plaintiff's satisfactory performance at some prior point in time gives rise to a presumption of illegality when the employer then takes this lack of qualifications into account in making the challenged decision. Yet, despite the plaintiff's failure to eliminate this "most common nondiscriminatory reason"—*i.e.,* his lack of qualifications— the burden shifts to the employer to rebut a "presumption" that never truly arose by providing a legitimate explanation for its action.

What is more, *Cline's* logic cannot be limited to the "qualified" prong of the *prima facie* case. The same "danger" identified in *Cline* would occur under the "similarly situated" prong in cases where, for example, the employer states that it demoted the plaintiff as a disciplinary measure for violating work rules. In this example, if the plaintiff identified a purportedly "similarly situated" employee who was not demoted, *Cline* seemingly dictates that the defendant employer could not inject a "second stage" issue into the *prima facie* inquiry by arguing that this other em-

■ *Cline*'s analysis is fatal to Defendant's argument here. Plaintiff has produced evaluations documenting his satisfactory performance prior to the course of events that led to his 1997 demotion. These evaluations indicate that Plaintiff was able to successfully fulfill the requirements of the IHR position from the date he was promoted in 1994 until his supervisors first began to identify various deficiencies in his job performance in 1995. This is sufficient to render Plaintiff "qualified" as that term is construed in *Cline*. The evidence offered by Defendant to undermine this conclusion—*i.e.*, the alleged shortcomings identified by Plaintiff's supervisors in 1995, 1996, and 1997—is the very same evidence offered to satisfy Defendant's burden of production at the second stage of the *McDonnell Douglas* inquiry. Yet, under *Cline*, the Court cannot consider Defendant's proffered non-discriminatory reasons in determining whether Plaintiff has satisfied the "qualified" element of his *prima facie* case. Accordingly, the Court rejects Defendant's principal challenge to Plaintiff's *prima facie* case, and concludes that Plaintiff has satisfied this initial burden.[12]

Under *McDonnell Douglas*, Defendant then bears the burden of producing evidence of a legitimate nondiscriminatory reason for its decision to demote Plaintiff.

It is apparent that Defendant has met this burden. In particular, Defendant points to various materials in Plaintiff's personnel file reflecting the imposition of successive "Immediate Action Plans," and documenting his deficiencies in sample administration, timeliness of reports, planning of field visits, keeping appointments, and working cooperatively with his supervisor. Defendant also cites the concerns expressed and documented by managers Julie Williams, Tim Bowling, and Larry Yarcheck after they accompanied Plaintiff on sales calls and found his performance lacking in such areas as itinerary, rapport and credibility, and presentation skills. Finally, Defendant has produced the affidavit of Plaintiff's second-level manager, Larry Yarcheck, setting forth his observations and conclusions as to Plaintiff's deficient job performance in 1996 and 1997 and his failure to correct problems despite repeated warnings, and stating that these matters formed the basis for his recommendation that Plaintiff be demoted. (*See* Defendant's Motion, Ex. O, Yarcheck Aff. at ¶¶ 2, 5–7.)

Thus, the Court turns to the third and final stage of the *McDonnell Douglas* inquiry: namely, whether Plaintiff has identified a triable issue that Defendant's "proffered reasons were not true reasons,

ployee was not truly "similarly situated" because he had not committed similar work rule violations and, therefore, had not "engaged in the same conduct" as the plaintiff. *See Mitchell v. Toledo Hosp.*, 964 F.2d 577, 583 (6th Cir.1992) (outlining the factors in the "similarly situated" inquiry). Under *Cline*, then, the "similarly situated" comparison, like the "qualified" inquiry, presumably would be confined to the employees' respective situations prior to the onset of the work rule violations. Despite these concerns, however, this Court recognizes that it is bound to follow *Cline*'s ruling on the "qualified" element of the *prima facie* case.

12. After presenting a lengthy challenge to the "qualified" element of Plaintiff's *prima facie* case, Defendant summarily asserts, in a single sentence, that Plaintiff also has failed to establish the fourth, "similarly situated" element of his *prima facie* case. (*See* Defen-

dant's Motion, Br. in Support at 11.) To be sure, Plaintiff has not shown that, following his demotion, his prior IHR position was filled by a younger or non-Pakistani individual. In addition, while Plaintiff suggests that other employees had variances in their sample inventories yet were not demoted, he has not shown (i) that these other individuals held the same IHR position or a position with similar responsibilities, (ii) that they were younger than Plaintiff or of different national origin, (iii) that they were cited for similar, ongoing problems in the administration of their sample inventories, or (iv) that their evaluations reflected unsatisfactory performance in other aspects of their jobs. Nonetheless, in light of Defendant's cursory argument on this issue, the Court will assume, for purposes of the present motion, that Plaintiff has established this element of his *prima facie* case.

but were a mere pretext for discrimination." *Lytle*, 579 N.W.2d at 915. The Michigan Supreme Court recently affirmed its adoption of what it termed the "intermediate position" for determining whether a plaintiff's showing of pretext is sufficient to survive a motion for summary judgment:

> Under this [intermediate] position, disproof of an employer's articulated reason for an adverse employment decision defeats summary disposition only if such disproof also raises a triable issue that discriminatory animus was a motivating factor underlying the employer's adverse action. In other words, plaintiff must not merely raise a triable issue that the employer's proffered reason was pretextual, but that it was a pretext for ... discrimination. Therefore, we find that, in the context of summary disposition, a plaintiff must prove discrimination with admissible evidence, either direct or circumstantial, sufficient to permit a reasonable trier of fact to conclude that discrimination was a motivating factor for the adverse action taken by the employer toward the plaintiff.

*Lytle*, 579 N.W.2d at 916 (footnotes omitted); *see also Town*, 568 N.W.2d at 68–69.

In its recent decision in *Reeves, supra*, the U.S. Supreme Court adopted a similar "intermediate position" in a case arising under the federal Age Discrimination in Employment Act. Specifically, the Court held that "a plaintiff's prima facie case, combined with sufficient evidence to find that the employer's asserted justification is false, may permit the trier of fact to conclude that the employer unlawfully discriminated." *Reeves*, —— U.S. at ——, 120 S.Ct. at 2109. However, the Court cautioned that such a showing will not *"always* be adequate to sustain a jury's finding of liability," and that "there will be instances where, although the plaintiff has established a prima facie case and set forth sufficient evidence to reject the defendant's explanation, no rational factfinder could conclude that the action was discriminatory." —— U.S. at ——, 120 S.Ct. at 2109.

In the present case, Plaintiff mounts two levels of attack on Defendant's stated justifications for its decision to demote him. First, he challenges the factual basis for many of the alleged deficiencies cited by his supervisors and noted in his personnel file. In response to the contention that he was untimely in the filing of expense reports and other paperwork, Plaintiff points to his affidavit as refuting this claim. Yet, Plaintiff's affidavit states only that his supervisor, Julie Williams, failed to process his expense reports in a timely manner. (Plaintiff's Response, Ex. B, Plaintiff's Aff. at ¶ 24.) This statement neither contradicts Defendant's claim as to Plaintiff's own untimeliness, nor addresses the more general criticism in his 1997 evaluations that he was late in providing various paperwork. Moreover, at his deposition, Plaintiff acknowledged that he occasionally submitted expense reports and other materials in an untimely manner. (Plaintiff's 1/21/00 Dep. at 147, 158–59.) He also conceded that he had missed or arrived late for appointments with client physicians. (*Id.* at 138, 157.)

■ Regarding Defendant's criticisms of his sales techniques—his weak itineraries and planning for field visits and his deficient presentation skills—Plaintiff contends that his sales figures belie these "subjective" appraisals, and he also points to the affidavits of four client physicians opining that Plaintiff is a knowledgeable and effective sales representative. (*See* Plaintiff's Response, Exs. P, Q, R, S.) In the recent case of *Parker v. Key Plastics, Inc.*, 68 F.Supp.2d 818, 829–30 (E.D.Mich. 1999), this Court addressed the standard for resolving disputes over the factual basis for an employer's proffered reasons for a challenged employment decision. This standard seeks to strike a balance between proper deference to an employer's business judgment and the legitimate need to probe the employer's stated reasons to ensure that they are not a mere shield for

invidious discrimination. 68 F.Supp.2d at 829–30. Thus, an employer's "honest belief" in a proffered reason for a challenged employment action will be upheld against a charge of pretext, even if this belief cannot be proven true, so long as the employer can identify "particularized facts" upon which it relied in forming this belief. *Id.* This "honest belief" test properly ensures that the plaintiff retains the ultimate burden of proving discrimination. *Cf. St. Mary's Honor Ctr. v. Hicks,* 509 U.S. 502, 523–24, 113 S.Ct. 2742, 2756, 125 L.Ed.2d 407 (1993) ("Title VII does not award damages against employers who cannot prove a nondiscriminatory reason for adverse employment action, but only against employers who are proven to have taken adverse employment action by reason of" an impermissible consideration such as race).

■ The Court is satisfied that Defendant has met this standard here. Defendant's determination of shortcomings in Plaintiff's sales techniques rests upon the findings of not one but three different supervisors—Julie Williams, Tim Bowling, and Larry Yarcheck—who separately accompanied Plaintiff on three days of sales calls at different points in 1997. Moreover, these individuals were able to pinpoint specific deficiencies in Plaintiff's sales performance, including his failure to thoroughly plan and prepare for his hospital visits,[13] his seeming lack of familiarity with certain hospital units and personnel, and the weaknesses in his presentations to physicians. (*See* Defendant's Motion, Exs. H, J, N.) As Yarcheck noted in his letter recommending Plaintiff's demotion, all three of these 1997 field reviews of Plaintiff's sales performance uniformly identified these same weaknesses in his sales techniques. (Defendant's Motion, Ex. N.) Given these consistent evaluations resting upon similar particularized facts, the Court concludes that Defendant is entitled to rely on its "honest belief" as to the deficiencies in Plaintiff's sales performance, even though this view might not be susceptible to "proof" by reference to Plaintiff's 1997 sales figures.[14]

More generally, the Court cannot agree with Plaintiff's apparent contention that there is something improper or inherently suspect in an employer's reliance on "subjective" criteria—by which Plaintiff presumably means factors that are not susceptible of precise or quantitative measurement—in making a challenged employment decision. To be sure, subjective factors are not exempt from scrutiny, and an employer that relies on such factors will be vulnerable to a charge of pretext if its "subjective" findings are contradicted by the available "objective" evidence. Yet, nothing in Michigan's Elliott–Larsen Act or its federal counterparts requires that an employer justify its decisions with mathematical precision or through quantifiable measures, or that these decisions be determined by a court to be objectively rational and reasonable. *See McDonald,* 898 F.2d at 1160 (observing that, under antidiscrimination law, "the aim is not to review bad business decisions, or question the soundness of an employer's judgment"); *Dubey v. Stroh*

13. Plaintiff challenges Larry Yarcheck's characterization of his itinerary as "weak," (Defendant's Motion, Ex. N), contending that Yarcheck never asked to see the itineraries that Plaintiff had brought with him on the day of Yarcheck's field review. (Plaintiff's Aff. at ¶ 31.) Yet, Yarcheck merely observed that Plaintiff seemingly did not consult an itinerary during the day, and that his sales efforts evinced a lack of focus reflective of a failure to properly plan for his hospital visit. (Defendant's Motion, Ex. N; *see also* Plaintiff's Response, Ex. N, Yarcheck Dep. at 33–35.) Thus, the Court finds no inherent contradiction in Yarcheck's characterization of Plaintiff's itinerary as "weak" without first having reviewed it in written form.

14. In this regard, however, the Court notes Plaintiff's admission in his affidavit that his sales figures during this period did indeed fall below the average he had achieved during his prior seven years of employment with Defendant. (Plaintiff's Aff. at ¶ 24.) Plaintiff blames this decrease on additional administrative burdens imposed by his supervisor, Julie Williams. (*Id.*)

*Brewery Co.*, 185 Mich.App. 561, 462 N.W.2d 758, 760 (1990) ("The soundness of an employer's business judgment ... may not be questioned as a means of showing pretext."). Moreover, the "objective" or "subjective" nature of the employer's proffered reasons for its action does nothing to alter the fact that the plaintiff retains the ultimate burden of proving that these reasons are a mere pretext for unlawful discrimination. *See Hicks*, 509 U.S. at 508, 113 S.Ct. at 2747–48.[15] Upon reviewing the record, the Court simply finds no evidentiary basis for concluding that the reasons advanced by Defendant, whether they be "subjective" or "objective," are lacking in factual support.

Next, apart from challenging the factual basis underlying Defendant's stated reasons for its decision to demote him, Plaintiff also contends that these reasons, even if accepted as valid, would have been insufficient to warrant his demotion. In mounting this challenge, Plaintiff focuses primarily on the variances in his sample inventories between 1995 and 1997. Specifically, he contends: (i) that he had cured these variances by October of 1997, fully three months before he was demoted; (ii) that others who were cited for variances were not demoted; (iii) that his supervisor, Julie Williams, allegedly falsified a sample inventory report but escaped punishment; (iv) that his prior supervisor, John Kresl, evidently did not think his sample variances important enough to mention them on his 1995 review; and (v) that, by demoting Plaintiff to a position that required more "detailing," or distribution of sam-

ples to physicians, Defendant actually increased Plaintiff's burden of tracking his sample inventory.

Certain of these arguments fail for want of an apt basis for comparison. In particular, Plaintiff has failed to identify any other employee who was not demoted despite repeated citations and warnings regarding the improper administration of samples. While Plaintiff points to one particular e-mail message identifying other employees (as well as Plaintiff) as having variances in their sample inventories, (*see* Plaintiff's Aff. at ¶ 28), this overlooks Plaintiff's long-standing variances over a period of years, as well as the numerous and explicit warnings given to Plaintiff that he must correct these variances. Similarly, the violation allegedly committed by Julie Williams, while admittedly serious, cannot be deemed comparable to Plaintiff's numerous deficiencies in sample administration. Next, while John Kresl might not have cited these deficiencies when they initially surfaced in 1995, there is no denying that he subsequently brought them to Plaintiff's attention, both in his 1996 performance review and in the first of a series of Immediate Action Plans.

Plaintiff, however, does cast a degree of doubt on Defendant's purported reliance on his neglect of his sample administration duties as a basis for demoting him. As noted by Plaintiff, and as acknowledged in Julie Williams' second 1997 review, Plaintiff had corrected the variance in his sample inventory well before he was demoted. Yet, Plaintiff's deficient sample administration is only one of several reasons cited by Defendant as forming the basis for Plain-

---

**15.** Indeed, the facts of *Hicks* itself illustrate this point. In that case, the District Court, acting as trier of fact, rejected the employer's proffered reasons as "not the real reasons for [the plaintiff's] demotion and discharge." *Hicks*, 509 U.S. at 508, 113 S.Ct. at 2748. Nonetheless, the lower court found that the plaintiff had failed to prove that his race was the determining factor in his employer's actions, because the record instead disclosed a "crusade to terminate" the plaintiff that was "personally motivated." 509 U.S. at 508, 113

S.Ct. at 2748. On remand from the Supreme Court, the District Court adhered to this finding of personal animosity, and the Court of Appeals affirmed. *Hicks v. St. Mary's Honor Ctr.*, 90 F.3d 285, 290–91 (8th Cir.1996). Plainly, then, even such a subjective consideration as personal dislike can be a "proper"—that is, not unlawful—basis for avoiding liability under antidiscrimination law, so long as this personal animus is not the product of the plaintiff's membership in a protected class.

tiff's demotion. Significantly, Larry Yarcheck's December 8, 1997 letter recommending this action nowhere mentions sample administration, and instead cites various shortcomings in Plaintiff's sales procedures and techniques. As discussed above, these findings have a sufficient factual basis to overcome Plaintiff's claim of pretext. Thus, even if sample administration is removed from the picture, Plaintiff has failed to show that Defendant's stated reasons are insufficient to warrant his demotion, particularly given the deference owed to an employer's legitimate business judgments.[16]

Finally, to the extent that Plaintiff questions whether a demotion would be an effective way to ensure that Plaintiff would fulfill his sample administration duties in the future, the Court again declines to second-guess Defendant's business judgment on this issue. Demotions are not necessarily intended solely to place the employee in a more suitable position, but also to "send a message" that the employer demands improved performance. Thus, while Plaintiff wishes to infer "pretext" from the fact that his sampling duties increased following his demotion, the Court could just as plausibly infer that Defendant's intended "message" was received from the fact that Plaintiff maintained a zero variance for a full year after his demotion.

In sum, the Court finds that Plaintiff has failed to identify a genuine issue of material fact as to Defendant's proffered non-discriminatory reasons for demoting him. More generally, upon surveying the evidentiary record, the Court simply fails to discern a triable issue as to whether Defendant's decision was motivated by impermissible considerations of Plaintiff's age or national origin. Plaintiff's *prima facie* case raises at best a weak inference

of discriminatory motive, and this inference is persuasively overcome by the unrefuted evidence of Defendant's legitimate reasons for its decision. Consequently, Defendant is entitled to summary judgment in its favor on Plaintiff's claims of age and national origin discrimination in his 1997 demotion.

## C. Plaintiff's Claims of Discriminatory Failure to Promote

### 1. Plaintiff's Failure–to–Promote Claims Arising Before May of 1996 Are Barred by Elliott–Larsen's Three–Year Statute of Limitations.

The Court now turns to Plaintiff's claim that he was denied various promotions on account of his age and/or national origin. As an initial matter, Defendant argues that Plaintiff's challenges to certain of these denials are time-barred, because Defendant's decisions with respect to these promotions occurred more than three years before Plaintiff brought this suit on May 26, 1999. The Court agrees.

Under Michigan law, a plaintiff must assert an Elliott–Larsen claim within three years after it accrues. *See Mair v. Consumers Power Co.*, 419 Mich. 74, 348 N.W.2d 256, 257–58 (1984) (applying the three-year statute of limitations set forth at Mich. Comp. Laws § 600.5805(8) to a claim brought under Elliott–Larsen). Plaintiff does not dispute this, but argues that Defendant's repeated denials of his various requests for promotions constitute a "continuing violation," so that his claims are timely so long as the last such denial fell within the three-year statute of limitations. *See Meek v. Michigan Bell Tel. Co.*, 193 Mich.App. 340, 483 N.W.2d 407, 409 (1991), *lv. app. denied*, 440 Mich. 872, 486 N.W.2d 743 (1992). The question becomes, therefore, whether the allegedly discriminatory promotion decisions chal-

---

**16.** Moreover, even if Plaintiff's underlying sample variances were corrected prior to his demotion, Defendant reasonably could have relied on its difficulties and substantial efforts expended in persuading Plaintiff to finally address this problem as support for other criti-

cisms leveled by Julie Williams—namely, that Plaintiff had to be "repeatedly asked" to complete certain administrative tasks, and that he sometimes failed to comply with his supervisor's directives. (Defendant's Motion, Ex. K, August 1997 performance review.)

lenged by Plaintiff in this case are "sufficiently related as to constitute a pattern," and hence a single continuing violation. *Meek*, 483 N.W.2d at 409.

The Court has no difficulty in concluding that Plaintiff has failed to allege a single "continuing violation" here. In *Sumner v. Goodyear Tire & Rubber Co.*, 427 Mich. 505, 398 N.W.2d 368 (1986), the Michigan Supreme Court set forth the three factors that should guide this inquiry:

> The first is subject matter. Do the alleged acts involve the same type of discrimination, tending to connect them in a continuing violation? The second is frequency. Are the alleged acts recurring (*e.g.*, a biweekly paycheck) or more in the nature of an isolated work assignment or employment decision? The third factor, perhaps of most importance, is degree of permanence. Does the act have the degree of permanence which should trigger an employee's awareness of and duty to assert his or her rights, or which should indicate to the employee that the continued existence of the adverse consequences of the act is to be expected without being dependent on a continuing intent to discriminate?

*Sumner*, 398 N.W.2d at 382 (quoting *Berry v. Board of Supervisors of L.S.U.*, 715 F.2d 971, 981 (5th Cir.1983)).

Only the first of these three factors lends any arguable support to Plaintiff's claim of a continuing violation. Broadly speaking, Plaintiff alleges that all of the promotions he was denied involved the "same types" of discrimination: namely, age and national origin discrimination.

Even here, however, there is nothing that "tends to connect" these denials, apart from the fact that they all involved Plaintiff. To the contrary, where these various decisions spanned an eight-year period, involved positions located around the country, and were made by several different executives, it would be difficult to view them as "connected" in any meaningful way.[17]

Moreover, the remaining two factors weigh heavily against a finding of a single continuing violation. Each challenged promotion decision clearly stands on its own, and cannot be viewed as a "recurring" event. Finally, and most importantly, each denial was a "permanent" decision, and was a sufficiently discrete event to trigger Plaintiff's awareness that he had suffered a distinct injury. Upon learning in each instance that he had not been selected for promotion, Plaintiff had suffered all of the "adverse consequences" he would ever suffer as a result of that particular decision; there was no need to "wait and see" what additional consequences might follow from this decision. Accordingly, the Court rejects Plaintiff's appeal to the "continuing violation" theory, and finds that Plaintiff's failure-to-promote claims are time-barred to the extent that they rest upon promotion denials occurring prior to May of 1996.

### 2. Plaintiff Has Failed to Produce Evidence Challenging Defendant's Stated Non–Discriminatory Reasons for Its Promotion Decisions.

■ Plaintiff has identified some half-dozen promotions that he was denied be-

---

**17.** To the extent that Plaintiff suggests that Defendant was operating under a broad "policy" of age or national origin discrimination, he has produced neither any direct evidence of such a policy, nor any of the sort of statistical evidence that might permit the Court to infer that such a policy existed. Plaintiff's "showing" on this point consists solely of the claim that Defendant's application process places an inordinate emphasis on athletic ability. Yet, the materials produced by Plaintiff in support of this assertion reveal nothing of the sort. To the contrary, the interview forms cited by Plaintiff direct the interviewer to inquire about traditional work-related topics such as educational background, prior work experience, motivation, work standards, initiative, communication skills, and the like. (*See* Plaintiff's Response, Ex. J (collecting interview forms summarizing initial interviews with Plaintiff's co-workers).) Moreover, the Court notes that Plaintiff's two promotions in 1990 and 1994 tend to undercut any claim of a corporate policy against promoting older or Pakistani workers.

tween May of 1996 and the end of 1998. As its initial basis for seeking summary judgment as to at least some of these claims, Defendant again argues that Plaintiff has failed to establish the "qualified" prong of his *prima facie* case. In particular, Defendant asserts that Plaintiff's demotion from an IHR position in December of 1997 defeats any contention that he was qualified for the three other IHR positions he sought in 1998.

The Court need not decide whether Plaintiff's 1997 demotion rendered him "unqualified" for subsequent IHR positions for purposes of establishing a *prima facie* case, or whether, under *Cline, supra,* Plaintiff's demotion should be viewed as a legitimate non-discriminatory reason put forward by Defendant to justify its refusal to return Plaintiff to an IHR position shortly after his demotion. Under either analysis, the outcome is the same. In particular, having already concluded as a matter of law that Plaintiff's December, 1997 demotion was not motivated by unlawful discrimination, the Court readily concludes that this demotion, and the reasons behind it, provide a sufficient nondiscriminatory basis for Defendant to deny Plaintiff a promotion back to an IHR position within a year of his demotion.

Moreover, regarding the two IHR positions sought by Plaintiff in the latter half of 1998,[18] Defendant has produced affidavits from the two individuals who made the decisions to fill these positions. Plaintiff has failed to point to any evidence that the legitimate reasons stated by these supervisors in support of their decisions—in both cases, their determinations that the selected individuals were the best candidates and possessed the best overall combination of skills, (*see* Defendant's Motion, Exs. R, S)—lack a factual basis, that these were not the reasons that actually motivated their decisions, or that these reasons were insufficient to motivate their decisions. *See Parker,* 68 F.Supp.2d at 829; *Dubey,* 462 N.W.2d at 760. Instead, Plaintiff cites his sales record and his achievements throughout his term of employment with Defendant, without any effort at showing how this record compares to the records of those individuals actually selected for promotion.[19]

Next, Plaintiff claims that Defendant unlawfully discriminated by denying him a position in California in late 1998. However, Plaintiff admitted at his deposition that the individual who made this employment decision, Margaret Yan, called to advise him that she had selected a person who "better suited her needs." (Plaintiff's 2/21/00 Dep. at 292.) His sole basis for challenging Yan's statement is his personal belief—admittedly unsupported by any evidence, (*see id.* at 294)—that this decision instead was based on the presence in his personnel file of a "negative and derogatory letter" written by Larry Yarcheck (presumably, Yarcheck's December 8, 1997 letter recommending Plaintiff's demotion). (*Id.* at 292.) Such subjective beliefs are insufficient to sustain a claim of discrimination. *See Mitchell, supra,* 964 F.2d at 585. In any event, even if Yan did review this letter, this would not serve as evi-

---

**18.** The third of these positions apparently became available in early 1998, shortly after Plaintiff's demotion. Thus, it is particularly difficult for Plaintiff to challenge Defendant's decision to deny this promotion back to an IHR position, so soon after Plaintiff had bee demoted from one. In addition, Plaintiff has not identified any "similarly situated" employee—*i.e.,* one who had also been recently demoted—who was promoted despite this recent demotion.

**19.** In his response to Defendant's motion, Plaintiff complains that his efforts to compare his record to those of other employees have been thwarted by Defendant's failure to produce the complete personnel files of these other individuals. (*See* Plaintiff's Response at 2–3 n. 1.) However, it is far too late in these proceedings to raise such discovery objections, particularly where Plaintiff has identified no reason why these objections could not have been asserted earlier, when the Court would have been in a position to provide effective remedies against any failures to produce required discovery.

dence of discrimination, where the letter merely set forth Yarcheck's non-discriminatory reasons for recommending Plaintiff's demotion.

Plaintiff next cites two positions he sought in August of 1996: a Regional Hospital Representative position ultimately filled by Tim Bowling, and the District Manager position vacated by his first supervisor, John Kresl, and ultimately filled by Julie Williams. In both cases, Larry Yarcheck made the contested hiring decisions. Defendant has produced an affidavit from Yarcheck, setting forth his non-discriminatory reasons for selecting Bowling and Williams, as well as his conclusion that both of these individuals were better qualified than Plaintiff for the positions in question. (*See* Defendant's Motion, Ex. O, Yarcheck Aff. at ¶¶ 3, 4.)

In seeking to challenge these conclusions, Plaintiff again relies on his overall sales record and generally favorable evaluations over the years. These brute facts, however, do nothing to undermine Defendant's assertion that the selected individuals had better overall records, and therefore compared favorably to Plaintiff. Moreover, any attempt to contest the validity of Defendant's comparisons would have to account for the fact that, during this same August 1996 time period, Plaintiff had been placed on an "Immediate Action Plan" due to his "neglect[ ]" of his sample administration duties. (Defendant's Motion, Ex. C.)[20] Nothing in the record suggests that the others to whom Plaintiff was being compared were also cited for similar deficiencies in sample administration. While Plaintiff might believe that sales performance should weigh more heavily in Defendant's promotion decisions, and that other factors such as sample administration should be given correspondingly less weight, Defendant is under no obligation to adopt a particular model of

decisionmaking, so long as the methodology it used did not rest upon discriminatory considerations. Here, there simply is no evidence that it did.

More generally, Plaintiff asserted at his deposition that the decisions to promote Bowling and Williams over him were but two more examples of his management's general bias against his age and national origin. Again, such subjective perceptions alone cannot sustain Plaintiff's claims of discrimination. In any event, to the extent that Plaintiff seeks to establish Defendant's discriminatory motives by pointing to an alleged "pattern and practice" of denying him promotions, the Court cannot help but note that Plaintiff was *twice* promoted by the same management he now charges with engaging in a longstanding pattern of discrimination spanning his entire term of employment.

Finally, Plaintiff cites instances in 1996 and 1998 where Defendant expanded or opened new divisions, yet did not promote him into one of the newly-established positions. However, Plaintiff has produced no evidence as to the qualifications of those who were selected for these new positions. In addition, his sole basis for charging Defendant with unlawful discrimination with respect to these positions is his conclusion, upon viewing pictures of the selected employees, that these individuals appeared to be largely white and uniformly younger than him. Such bald conjecture, without any evidentiary support whatsoever, does not suffice to establish a *prima facie* case with respect to these new positions. Consequently, the Court finds that Defendant is entitled to summary judgment in its favor on these and Plaintiff's other failure-to-promote claims arising from promotion decisions made after May of 1996.

---

**20.** Defendant also points to the handwritten note on an April 3, 1995 e-mail to Plaintiff advising him of sample variances significantly outside Defendant's acceptable range, in which Larry Yarcheck states to Plaintiff's immediate supervisor, John Kresl, that Plaintiff "needs to take serious action in correcting" these variances if he "wants to be considered for promotions." (Defendant's Motion, Ex. B.)

## IV. *CONCLUSION*

For the reasons set forth above,

IT IS HEREBY ORDERED that Defendant's April 14, 2000 Motion for Summary Judgment is GRANTED.